UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

REMCODA, LLC,

                              Plaintiff,

                – against –

RIDGE HILL TRADING (PTY) LTD,
ATARAXIA CAPITAL PARTNERS PTY LTD,
DE RAJ GROUP AG, PETRICHOR CAPITAL
SDN-BHD, PETRICHOR CAPITAL
TRADING LIMITED, VAIDYANATHAN
MULANDRAM NATESHAN, GAYATHRI
VAIDYANATHAN, MENUSHA
GUNAWARDHANA, VINCENT FLETCHER,
and RUSSELL GROSS,

                              Defendants.

**OPINION & ORDER**

21 Civ. 979 (ER)

RAMOS, D.J.:

     Remcoda, LLC filed this action on February 3, 2021 alleging that defendants jointly

engaged in a fraudulent scheme in which they contracted with Remcoda to provide nitrile gloves

during the COVID-19 pandemic and never performed.  Doc. 1.  Remcoda amended the

complaint on June 30, 2021.  Doc. 56.  Remcoda brings claims of fraudulent inducement, aiding

and abetting fraud, breach of contract, money had and received, and unjust enrichment.  Doc. 56.

     On August 11, 2021, defendants Petrichor Capital Sdn-Bhd ("Petrichor Malaysia"),

Petrichor Capital Trading Limited ("Petrichor UK"), Vaidyanathan Mulandram Nateshan, and

Gayathri Vaidyanathan (collectively, the "Petrichor Defendants") filed a motion to dismiss for

lack of personal jurisdiction and failure to state a claim.  Doc. 76.  On the same day, defendants

Ridge Hill Trading (PTY) LTD, Ataraxia Capital Partners PTY LTD, Menusha Gunawardhana,

and Vincent Fletcher (collectively, the "Ridge Hill Defendants") filed a separate motion to

dismiss for invalid service of process and failure to state a claim.  Doc. 82.  Lastly, on November 10, 2021, defendant Russell Gross filed a motion to dismiss for failure to state a claim.  Doc. 107.  Defendant De Raj Group AG has not appeared.

For the reasons set forth below, the Petrichor Defendants' motion to dismiss is GRANTED, the Ridge Hill Defendants' motion to dismiss is GRANTED in part and DENIED in part, and Gross' motion to dismiss is GRANTED in part and DENIED in part.

## I.    BACKGROUND

The following facts are from the amended complaint, Doc. 56, unless otherwise indicated, and are assumed to be true for purposes of the instant motion.  *See Hesse v. Godiva Chocolatier, Inc.*, 463 F. Supp. 3d 453, 462 (S.D.N.Y. 2020).

Remcoda is a New York limited liability company with its principal place of business in New York and, at times relevant to the complaint, whose sole member resides in Florida.  Doc. 56 ¶ 5.

Defendant De Raj Group is a German stock corporation with offices in Malaysia and Germany.  *Id.* ¶ 9.  Defendant Petrichor Malaysia is a company with its principal place of business in Malaysia.  *Id.* ¶ 10.  Defendant Petrichor UK is a company with an office in the United Kingdom.  *Id.* ¶ 11.  Defendant Nateshan is the CEO of De Raj and a director of Petrichor Malaysia and Petrichor UK.  *Id.* ¶ 12.  Defendant Vaidyanathan is a shareholder of De Raj and a director of Petrichor Malaysia and Petrichor UK.  *Id.* ¶ 13.  Nateshan and Vaidyanathan are married and reside in India.  *Id.*  ¶¶ 12–13.  De Raj, Petrichor Malaysia, and Petrichor UK are jointly controlled by Nateshan and Vaidyanathan with shared assets, and De Raj's assets have been transferred to Petrichor UK and Malaysia.  *Id.* ¶ 14.

Defendants Ridge Hill and Ataraxia are Australian companies with offices in Sri Lanka and Australia.  *Id.* ¶¶ 6–7.  Defendant Gunawardhana is an employee or agent of Ridge Hill residing in Sri Lanka.  *Id.* ¶ 15.  Defendant Fletcher is an employee or agent of Ridge Hill residing in the UK.  *Id.* ¶ 16.

Defendant Gross is an employee or agent of Ridge Hill residing in New York.  *Id.* ¶ 17.

The complaint also alleges that Ridge Hill and Ataraxia:

> share an office address, have an overlap in ownership and directors . . . and personnel, and their owners, directors, and employees use Ataraxia email addresses to conduct business purportedly on behalf of Ridge Hill.  Ataraxia purports to use the entity known as Ridge Hill to operate and conduct Ataraxia's personal protective equipment business, but does so with the assets and personnel of Ataraxia.  Upon information and belief, Ridge Hill and Ataraxia are not treated as independent profit centers, and funds are commingled between Ridge Hill and Ataraxia.  Ridge Hill and Ataraxia, upon information and belief, do not deal with each other at arm's length, use each other's property as if it were their own, and pay and guarantee the debts of each other.  As such, Ridge Hill and Ataraxia are alter egos and Ataraxia dominated Ridge Hill with respect to its transaction and dealings with Plaintiff.

*Id.* ¶¶ 8, 80.

In the summer of 2020, Remcoda agreed to provide nitrile gloves to two large food distribution companies in the United States.  *Id.* ¶ 20.  In June 2020, Remcoda spoke with Gross, who represented that he was an experienced seller of personal protective equipment (PPE) and had relationships with manufacturers and suppliers of PPE.  *Id.* ¶ 21.  Remcoda entered into a procurement agreement with Gross on June 8, 2020.  Doc. 109-1.  The procurement agreement reads:

> **WHEREAS** Procurement Agent [Gross] has proprietary manufacturing and supply relationships for personal protective equipment . . .
>
> **WHEREAS** Purchaser [Remcoda] has relationships with and is purchasing on behalf of large corporations as well as first line responders and other end users.
>
> **WHEREAS** [Remcoda] wishes to engages the services of [Gross] to procure Medical Supplies on behalf of their clients in exchange for [the procurement fee] . . .

**NOW, THEREFORE** in consideration of the foregoing and the mutual promises and covenants set forth in this [a]greement and for other goods and valuable consideration . . . [Remcoda and Gross] agree as follows: . . . .

*Id.* at 2.  As relevant here, the agreement further states that Remcoda would engage Gross's services to procure medical supplies in exchange for a payment of 5% of the purchase price for each transaction consummated with a covered supplier.  *Id.* ¶ 5.

Gross then offered to introduce Remcoda to suppliers and manufacturers so Remcoda could procure the gloves it needed.  Doc. 56 ¶ 22.  Gross requested proof of funds for the transaction.  *Id.*  Remcoda agreed and provided proof of funds, leading Gross to introduce Remcoda to Gunawardhana and Fletcher as agents of Ridge Hill, a company that Gross claimed could immediately provide the gloves.  *Id.* ¶ 23.  Over email and text messages beginning June 9, 2020, Gunawardhana and Fletcher began negotiating an agreement between Ridge Hill and Remcoda.  *Id.* ¶ 24.  Remcoda provided information on the size and color of the gloves and information on the exact packaging requirements, and informed them that the gloves needed to be delivered by July 31, 2020.  *Id.* ¶¶ 25–29.  Gross initially indicated that Ridge Hill would finance the transaction, but later recanted.  *Id.* ¶ 30–31.  On July 9, 2020, Gunawardhana advised that Remcoda would need to pay a 50% deposit on the gloves with the balance to be paid after third party inspection before delivery, which would occur within 7–10 working days of the deposit.  *Id.* ¶ 31.  Remcoda asked how Ridge Hill would secure enough stock of gloves, to which Gunawardhana repeatedly stated in emails from July 13 to July 16, 2020 that Remcoda's deposit was secure and that stock allocation would not be an issue as the black and blue gloves it needed had been acquired.  *Id.* ¶¶ 34–35.

On July 16, 2020, Remcoda entered into an agreement with Ridge Hill to pay a total of $9,261,748 for approximately 1.3 million boxes of nitrile gloves, which were to be delivered by

July 31, 2020.[1]  Doc. 56 ¶¶ 39–40, 43.  Ridge Hill was required to provide a third-party

inspection of the gloves and an inspection report prior to delivery.  *Id.* ¶ 41.  On July 20, 2020,

Remcoda paid a 50% deposit on the gloves to Ridge Hill in the amount of $4,630,874.  *Id.* ¶ 44.

Over the next six weeks, despite repeated assurances by Gross and the Ridge Hill defendants that

the gloves would be delivered and repeated requests that Remcoda pay the balance of the

contractual fee, the gloves were never delivered.

On July 23, 2020, Gunawardhana sent Remcoda photographs of boxes of gloves, and on

July 27, 2020, he told Remcoda that all the stock had been allocated and had passed inspection.

*Id.* ¶ 46.  However, Ridge Hill provided no proof of inspection and claimed that another

inspection would be performed.  *Id.* ¶ 47.  On the same day, Gunawardhana demanded that

Remcoda pay the balance of the purchase price ($4,630,874), which Remcoda refused.  *Id.*  On

July 28, 2020, Gross vouched for Ridge Hill by telling Remcoda that Ridge Hill and Ataraxia

were a "family group" based in Australia, and "mutual owners" were managing the PPE supply

chain. *Id.* ¶ 48.  On July 28, 2020, Gunawardhana forwarded to Remcoda an email from

Vaidyanathan claiming that "government intervention" in Vietnam had delayed the order but De

Raj would use its connections to make the gloves ready for delivery shortly, and an inspection

had been scheduled for July 30, 2020 with shipment to occur on August 8, 2020.  *Id.* ¶ 49.

Remcoda did not receive the gloves by the agreed delivery date of July 31, 2020.  *Id.* ¶

50.  On that date, Gunawardhana told Remcoda that Ridge Hill did not have black gloves as

---

[1] Ridge Hill has provided the sales agreement , Doc. 83-2, which the Court finds is incorporated into the complaint by reference since it is clearly and substantially referenced in the complaint.  *See Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 815 F. Supp. 2d 679, 691 (S.D.N.Y. 2011) (stating that to be incorporated into the complaint by reference, "the [c]omplaint must make a clear, definite and substantial reference to the documents") (internal quotation marks and citation omitted).

agreed but could instead provide additional blue gloves.  *Id.* ¶ 51.  Due to time constraints, Remcoda agreed to accept the blue gloves.  *Id.* ¶ 52.

On August 2, 2020, Gunawardhana emailed Remcoda claiming that the deposit had been used up and that Remcoda would have to pay the second installment of $4,630,874 immediately. *Id.* ¶ 53.  On the same date, Fletcher demanded that Remcoda make an immediate payment of $11 million in exchange for delivery of the gloves by the end of August.  *Id.* ¶ 54.  Remcoda refused and demanded the gloves be delivered immediately.  *Id.* ¶ 56.  Gunawardhana then assured Remcoda that the gloves would be delivered in two shipments on August 13 and 15, 2020.  *Id.* ¶ 57.  On August 3, 2020, he told Remcoda that an inspection had been booked and the report was forthcoming.  *Id.*

Around this time, Ridge Hill also told Remcoda that it had been working with Nateshan and De Raj to fulfill the contract and had transferred Remcoda's deposit to Nateshan.  *Id.* ¶ 58. Nateshan then sent Remcoda purported payment receipts from De Raj to a factory that they alleged was manufacturing the gloves.  *Id.* ¶ 59.  On August 4, 2020, Fletcher forwarded to Remcoda an email from Vaidyanathan that appeared to forward an email from an inspection company scheduling an inspection for August 7, 2020.  *Id.* ¶ 60.  Defendants then used this email to attempt to get Remcoda to make an additional payment.  *Id.*  Gunawardhana sent additional photographs of gloves to Remcoda on August 5, 2020, and on August 10, 2020 he told Remcoda that Ridge Hill would send the inspection report "shortly."  *Id.* ¶¶ 61–62.  On August 14, 2020, having still not received the inspection report, Remcoda demanded to see it, but Gunawardhana refused, stating that it would be sent once all the gloves were packed.  *Id.* ¶ 63.

On August 25, 2020, having still not received the inspection report or the gloves, Remcoda terminated the agreement with Ridge Hill by letter, copied to De Raj, and demanded

repayment of the 50% deposit.  *Id.* ¶ 64.  On August 27, 2020, Vaidyanathan wrote a letter to Remcoda as director of Petrichor Malaysia with the subject line "Acceptance for refund of funds paid for purchase of Nitrile Gloves."  *Id.* ¶ 66.  In the letter, he confirmed that Petrichor Malaysia was "a related company" to De Raj and Petrichor UK and promised to refund the amount paid. *Id.*  The letter further explained that the funds had been transferred to Petrichor UK, but Petrichor Malaysia would return the funds.  *Id.*  He further stated that they would "be using [their] group resources to make this refund" immediately.  *Id.*

On September 2, 2020, Remcoda received a partial refund of $1 million from Petrichor UK, followed by an additional $1 million payment from Petrichor Malaysia on September 15, 2020.  *Id.* ¶ 67.  On October 26, 2020, Petrichor Malaysia transferred $200,000 to Ridge Hill which it then transferred to Remcoda.  *Id.* ¶ 68.  In a letter dated October 31, 2020, Nateshan wrote to Ridge Hill as "Group Chief Executive Officer" for Petrichor UK to confirm that De Raj would refund the remaining $2,430,836.65 according to the following payment schedule: $450,000 on November 16, 2020; $550,000 on November 27, 2020; $600,000 on December 11, 2020; $450,000 on December 18, 2020; and $380,836 on December 30, 2020.  *Id.* ¶ 69. Remcoda never received any of these scheduled payments.  *Id.* ¶ 70.

Throughout the complaint, Remcoda alleges that defendants acted jointly to defraud Remcoda.  *See id.* ¶ 40 (Gunawardhana forwarded a fraudulent email from Vaidyanathan claiming that government intervention in Vietnam was delaying the order but De Raj would resolve the issue); ¶¶ 46, 61 (Gunawardhana sent Remcoda photographs of boxes of gloves allegedly allocated for the order); ¶ 59 (Nateshan and Defendants created fraudulent receipts to conceal their fraud); ¶ 60 (Fletcher forwarded a fraudulent email from Vaidyanathan showing a

scheduled inspection, which Gunawardhana then used to seek additional funds); ¶ 71 (Gross was working with all the defendants from the start).

Lastly, Remcoda alleges injury in the amount of $676,040 for lost profits due to its failure to provide gloves to its customers, and at least $650,000 in interest that it has had to pay on the loans it obtained to finance the agreement. *Id.* ¶ 72.

## II.   LEGAL STANDARD

### A.  Service of Process

Individuals and entities located outside the United States may be served "by any internationally agreed means of service that is reasonably calculated to give notice" — including the Hague Convention — or "by other means not prohibited by international agreement, as the court orders." Fed. R. Civ. P. 4(f)(1), (3), (h)(2).  Any service ordered by this Court "must comply with constitutional notions of due process and constitute 'notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'"  *S.E.C. v. China Ne. Petroleum Holdings Ltd.*, 27 F. Supp. 3d 379, 398 (S.D.N.Y. 2014) (ultimately quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)).  There is no strict requirement that a plaintiff pursue service through an international agreement before asking a court's assistance in ordering alternative service, and the decision of whether to allow that service is committed to the sound discretion of the district court.  *See Wash. State Inv. Bd. v. Odebrecht S.A.*, No. 17 Civ. 8118 (PGG), 2018 WL 6253877, at *3–4 (S.D.N.Y. Sept. 21, 2018).

### B.  Personal Jurisdiction

"A plaintiff opposing a motion to dismiss under Rule 12(b)(2) for lack of personal jurisdiction has the burden of establishing that the court has jurisdiction over the defendant."

*BHC Interim Funding, LP v. Bracewell & Patterson, LLP*, No. 2 Civ. 4695 (LTS), 2003 WL

21467544, at *1 (S.D.N.Y. June 25, 2003) (citing *Bank Brussels Lambert v. Fiddler Gonzalez &*

*Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999)).  To meet this burden where there has been no

discovery or evidentiary hearing, the plaintiff must plead facts sufficient for a *prima facie*

showing of jurisdiction.  *Id.*  As the Court evaluates a Rule 12(b)(2) motion, it must construe all

of the plaintiff's allegations as true and resolve all doubts in its favor.  *Casville Invs., Ltd. v.*

*Kates*, No. 12 Civ. 6968 (RA), 2013 WL 3465816, at *3 (S.D.N.Y. July 8, 2013) (citing *Porina*

*v. Marward Shipping Co.*, 521 F.3d 122, 126 (2d Cir. 2008)).  "However, a plaintiff may not rely

on conclusory statements without any supporting facts, as such allegations would 'lack the

factual specificity necessary to confer jurisdiction.'"  *Art Assure Ltd., LLC v. Artmentum GmbH*,

No. 14 Civ. 3756 (LGS), 2014 WL 5757545, at *2 (S.D.N.Y. Nov. 4, 2014) (quoting *Jazini v.*

*Nissan Motor Co., Ltd.*, 148 F.3d 181, 185 (2d Cir. 1998)).  As Rule 12(b)(2) motions are

"inherently . . . matter[s] requiring the resolution of factual issues outside of the pleadings,"

courts may rely on additional materials outside the pleadings when ruling on such motions.  *John*

*Hancock Prop. & Cas. Ins. Co. v. Universale Reinsurance Co.*, No. 91 Civ. 3644 (CES), 1992

WL 26765, at *1 n.1 (S.D.N.Y. Feb. 5, 1992); *accord Darby Trading Inc. v. Shell Int'l Trading*

*and Shipping Co.*, 568 F. Supp. 2d 329, 334 (S.D.N.Y. 2008).

  In diversity or federal question cases, personal jurisdiction is determined in accordance

with the law of the forum in which the federal court sits.  *Whitaker v. Am. Telecasting, Inc.*, 261

F.3d 196, 208 (2d Cir. 2001) (citing *Bensusan Rest. Corp. v. King*, 126 F.3d 25, 27 (2d Cir.

1997)).  This determination involves a two-step analysis.  *Metro. Life Ins. Co. v. Robertson-Ceco*

*Corp.*, 84 F.3d 560, 567 (2d Cir. 1996).  In New York, the court must first determine whether

personal jurisdiction is appropriate pursuant to the state's general jurisdiction statute, Civil

Practice Law and Rules ("C.P.L.R.") § 301, or its long-arm jurisdiction statute, C.P.L.R. § 302. If the Court's exercise of personal jurisdiction is deemed appropriate according to New York law, the second step is an evaluation of whether the court's exercise of personal jurisdiction comports with the Fifth Amendment Due Process Clause of the United States Constitution. *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 164 (2d Cir. 2010); *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007).

"[T]he classic, but not exclusive bases of general jurisdiction [for a corporation] are a corporation's place of incorporation and principal place of business." *Brown v. Web.com Grp., Inc.*, 57 F. Supp. 3d 345, 354 (S.D.N.Y. 2014) (citing *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014)). "Additional indicia of a corporation's presence in the forum include whether it has employees, agents, offices, bank accounts, or property within the state; whether it is authorized to do business there; the volume of business it conducts with state residents; whether it has a phone listing in the state; whether it does public relations work there; and whether it pays state income or property taxes." *Id.* (citing *Hutton v. Priddy's Auction Galleries, Inc.*, 275 F. Supp. 2d 428, 437 (S.D.N.Y. 2003); *Bossey ex rel. Bossey v. Camelback Ski Corp.*, 21 Misc. 3d 1116(A), No. 36142-07, 2008 N.Y. Slip Op. 52080(U), at *3, 2008 WL 4615680 (N.Y. Sup. Ct. 2008)).

C.P.L.R. § 302(a)(3) states that a court

> may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent . . . commits a tortious act without the state causing injury to person or property within the state, . . . if he (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce[.]

The New York Court of Appeals has identified five elements a plaintiff must show to establish personal jurisdiction under Section 302(a)(3)(ii): "(1) the defendant committed a tortious act

outside New York; (2) the cause of action arose from that act; (3) the tortious act caused an

injury to a person or property in New York; (4) the defendant expected or should reasonably

have expected the act to have consequences in New York; and (5) the defendant derived

substantial revenue from interstate or international commerce." *See Miller Inv. Trust v. Xiangchi

Chen*, 967 F. Supp. 2d 686, 694 (S.D.N.Y. 2013) (quoting *Penguin Grp. (USA) Inc. v. Am.

Buddha*, 16 N.Y.3d 295, 302 (2011)).

For the third element, to determine where the injury occurred, courts apply a "situs-of-

injury test, which asks them to locate the original event which caused the injury." *Bank Brussels

Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 791 (2d Cir. 1999) (internal quotation

marks and citations omitted).  "It is well-settled that residence or domicile of the injured party

within New York is not a sufficient predicate for jurisdiction under section 302(a)(3)." *Troma

Ent., Inc. v. Centennial Pictures Inc.*, 729 F.3d 215, 218 (2d Cir. 2013) (internal quotation marks,

citation, and alterations omitted).  In particular, "the suffering of economic damages in New

York is insufficient" to establish jurisdiction over a defendant under this statute. *Id.* (internal

quotation marks and citation omitted).  For the fifth element, though no bright-line rule exists

regarding the amount at which revenue becomes "substantial," courts will generally assess either

(1) the percentage of a party's overall revenue derived from interstate commerce, or (2) the

absolute revenue generated by a defendant's interstate commerce activities. *See Light v. Taylor*,

No. 5 Civ. 5003 (WHP), 2007 WL 274798, at *4 (S.D.N.Y. Jan. 29, 2007).

Due process then requires that a defendant have "sufficient minimum contacts with the

forum" to justify a court's exercise of personal jurisdiction, such that the "the assertion of

personal jurisdiction over the defendant comports with traditional notions of fair play and

substantial justice." *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 331 (2d Cir. 2016)

(internal quotation marks and citations omitted).  The due process inquiry has two parts:  (1) "the court must determine whether the defendant has sufficient contacts with the forum state to justify the court's exercise of personal jurisdiction," and (2) "the court must determine whether the assertion of personal jurisdiction is reasonable under the circumstances of the particular case."  *Schottenstein v. Schottenstein*, No. 04 Civ. 5851 (SAS), 2004 WL 2534155, at *7 (S.D.N.Y. Nov. 8, 2004) (citing *Metro. Life*, 84 F.3d at 567).  "The import of the 'reasonableness' inquiry varies inversely with the strength of the 'minimum contacts' showing— a strong . . . showing by the plaintiff on 'minimum contacts' reduces . . . the weight given to 'reasonableness.'"  *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 129 (2d Cir. 2002) (citing *Metro. Life*, 84 F.3d at 568–69).

### C.  Failure to State a Claim

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *Christie's Int'l PLC*, 699 F.3d at 145.  However, the Court is not required to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also id.* at 681 (citing *Twombly*, 550 U.S. at 551).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"  *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  More specifically, the plaintiff must allege sufficient facts to show "more than a sheer possibility that a

defendant has acted unlawfully." *Id.*  If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

## III.    DISCUSSION

### A.  Petrichor Motion to Dismiss

The amended complaint asserts five causes of action against the Petrichor Defendants: (1) fraudulent inducement to enter the agreement, Doc. 56 ¶ 74; (2) aiding and abetting Ridge Hill's fraud, *id.* ¶ 85; (3) breach of contract, *id.* ¶ 99; (4) money had and received (quasi-contract), *id.* ¶ 102; and (5) unjust enrichment (quasi-contract), *id.* ¶ 106.  The Petrichor Defendants move to dismiss the amended complaint for lack of personal jurisdiction and failure to state a claim.  Doc. 76.

The Court does not have general jurisdiction over the Petrichor Defendants.  Petrichor Malaysia and Petrichor UK are incorporated in and have their principal places of business in Malaysia and the UK, respectively.  Doc. 56 ¶¶ 10‒11.  Additionally, the complaint alleges that Nateshan and Vaidyanathan are residents of India, although Nateshan has declared that the two have lived in Malaysia for five years.  *Id.* ¶¶ 12–13; Doc. 78 ¶ 3.  Either way, it is clear that these Defendants are not "at home" in New York, and thus the Court does not have general jurisdiction over them under C.P.L.R. § 301.

Remcoda argues that the Court has personal jurisdiction over the Petrichor Defendants under New York's long-arm statute, C.P.L.R. § 302(a)(3).  The only claims with the potential to support a finding of personal jurisdiction because of tortious activity in the state are the claims for fraudulent inducement and aiding and abetting fraud, as the contract and quasi-contract

claims are not tort claims. *See Orkin v. Swiss Confederation*, 770 F. Supp. 2d 612, 617 n.35 (S.D.N.Y. 2011) (finding that quasi-contract doctrines are not tort claims); *AVRA Surgical Robotics, Inc. v. Gombert*, 41 F. Supp. 3d 350, 358 (S.D.N.Y. 2014) (finding that "New York law limits jurisdiction to tort claims," so a contract claim could not support a finding of personal jurisdiction under C.P.L.R. § 302(a)).

To demonstrate an injury in New York sufficient to warrant jurisdiction, Remcoda argues that the Petrichor Defendants directed misrepresentations towards Remcoda in New York, and in reliance on those misrepresentations, Remcoda was injured when it disbursed funds from its New York bank account to enter into the agreement. Doc. 94 at 33. While the complaint does not allege that the Petrichor Defendants were involved in the agreement until well after the agreement was signed, *see* Doc. 56 ¶ 58, the complaint does allege that Gross was fraudulently orchestrating all of the defendants from the start of his interaction with Remcoda, *id.* ¶ 70. The complaint also alleges that Nateshan sent Remcoda purported payment receipts from De Raj to a factory that Nateshan alleged was manufacturing the gloves. *Id.* ¶ 59. The complaint further alleges that the receipts were fraudulently created to conceal the theft of Remcoda's deposit. *Id.* This is the only alleged instance of direct communication between Remcoda and any of the Petrichor Defendants during the period of the alleged fraudulent agreement. This single communication, coupled with Remcoda's allegations that Gross worked with all of the defendants to defraud Remcoda, could lead to injury in New York.

However, courts have made clear that financial injury is generally not sufficient. An injured party's domicile or residence in New York cannot, alone, establish jurisdiction. *Energy Brands Inc. v. Spiritual Brands, Inc.*, 571 F. Supp. 2d 458, 467 (S.D.N.Y. 2008). Nor can "[t]he occurrence of financial consequences in New York due to the fortuitous location of plaintiffs in

New York . . . where the underlying events took place outside New York." *United Bank of Kuwait v. James M. Bridges, Ltd.*, 766 F. Supp. 113, 116 (S.D.N.Y. 1991).  Conversely, "harm to a business in the New York market through lost sales or lost customers" may meet the requirement of injury in the forum state, *Energy Brands*, 571 F. Supp. 2d at 467 (quoting *Am. Network, Inc. v. Access Am./Connect Atlanta, Inc.*, 975 F. Supp. 494, 497 (S.D.N.Y.1997)), but "those lost sales must be in the New York market, and those lost customers must be New York customers." *Darby Trading Inc. v. Shell Int'l Trading & Shipping Co.*, 568 F. Supp. 2d 329, 336 (S.D.N.Y. 2008).  As Remcoda has not alleged specific facts from which the Court can infer loss of New York customers and sales, the situs-of-injury test is not satisfied.  *See Brown v. Web.com Grp., Inc.*, 57 F. Supp. 3d 345, 356 (S.D.N.Y. 2014).  Remcoda has not sufficiently pleaded injury in New York, and therefore the Court does not have jurisdiction over the Petrichor Defendants under C.P.L.R. § 302(a)(3).

Remcoda alternatively argues that the Court has personal jurisdiction over the Petrichor Defendants as co-conspirators of the Ridge Hill Defendants and Gross, who have not challenged their personal jurisdiction.  Doc. 94 at 35.  To establish conspiracy jurisdiction, a plaintiff must allege "that (1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state." *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 87 (2d Cir. 2018).  Under New York law, a "bland assertion of conspiracy . . . is insufficient to establish jurisdiction." *Lehigh Val. Indus., Inc. v. Birenbaum*, 527 F.2d 87, 93 (2d Cir. 1975).  Here, although Remcoda has alleged that "Gross . . . was working with Defendants from the start," Doc. 56 ¶ 71, Remcoda has provided no facts beyond this bare assertion to support the existence of a conspiracy sufficient to confer jurisdiction over the

Petrichor Defendants.  *See Lehigh*, 572 F.2d at 93–94 (finding no conspiracy jurisdiction where there were no allegations of specific facts connecting the defendant to the forum).

The Petrichor motion to dismiss for lack of personal jurisdiction is therefore granted. Having concluded that the Court lacks personal jurisdiction, the Court need not address the motion for failure to state a claim.  *See Prospect Funding Holdings, LLC v. Vinson*, 256 F. Supp. 3d 318, 323 (S.D.N.Y. 2017) ("As the jurisdictional issue is decisive here, the Court does not reach [the] Rule 12(b)(6) argument.").

## B.  Ridge Hill Motion to Dismiss

The amended complaint asserts four causes of action against the Ridge Hill Defendants: (1) fraudulent inducement to enter the agreement, Doc. 56 ¶ 74; (2) breach of contract, *id.* ¶ 92; (3) money had and received (quasi-contract), *id.* ¶ 102; and (4) unjust enrichment (quasi-contract), *id.* ¶ 106.  The Ridge Hill Defendants move to dismiss the amended complaint for invalid service of process and failure to state a claim.  Doc. 82.

### 1.  Service of Process

On May 19, 2021, Remcoda submitted an *ex parte* application for an order authorizing alternative service of the Ridge Hill Defendants, among others, pursuant to Fed. R. Civ. P. 4(f)(3).  Doc. 33.  Specifically, Remcoda requested alternative service by means of delivery of copies of the approved order, summons, and complaint to counsel for the Ridge Hill Defendants at their offices in Australia.  Doc. 33-1.  On May 21, 2021, the Court issued an order authorizing alternative service as described above.  Doc. 35.  On May 24, 2021, Remcoda filed an affidavit of service declaring that the Ridge Hill Defendants were served in accordance with the order on May 21, 2021 by mailing the documents to the Australia offices of counsel for the Ridge Hill

Defendants in Sydney and Brisbane, as well as via email to their counsel, Craig Roelofsz.  Doc. 36.

The Ridge Hill Defendants now argue that service was invalid, as it did not adhere to the Hague Convention.  However, "[t]here is no strict requirement that a plaintiff pursue service through an international agreement before asking a court's assistance in ordering alternative service, and the decision of whether to allow that service is committed to the sound discretion of the district court."  *Peifa Xu v. Gridsum Holding Inc.*, No. 18 Civ. 3655 (ER), 2020 WL 1508748, at *14 (S.D.N.Y. Mar. 30, 2020) (citing *Wash. State Inv. Bd. v. Odebrecht S.A.*, No. 17 Civ. 8118 (PGG), 2017 WL 6253877, at *3–4 (S.D.N.Y. Sept. 21, 2018)).  As the Court has already issued an order authorizing alternative service after consideration of Remcoda's attempts at service, Doc. 35, the Court will not now find that service of the Ridge Hill Defendants complying with that order is improper.  Ridge Hill's motion to dismiss for improper service is thus denied.

## 2.  Failure to State a Claim

### i.  Ataraxia as an Alter Ego of Ridge Hill

The Ridge Hill Defendants argue that the claims against Ataraxia should be dismissed because the complaint does not sufficiently allege that Ataraxia is liable as an alter ego of Ridge Hill.  Doc. 83 at 19.

"New York courts apply a presumption of separateness to corporations and are hesitant to disregard the corporate form."  *Prescient Acquisition Grp., Inc. v. MJ Pub. Trust*, 2006 WL 2136293, at *4 (S.D.N.Y. July 31, 2006) (citing *DeJesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 70 (2d Cir. 1996)).  To prove that the corporate veil should be pierced under New York law, a plaintiff must show "(1) that the owner exercised complete domination over the corporation with

17

respect to the transaction at issue; and (2) that such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil." *Thrift Drug, Inc. v. Universal Prescription Adm'rs*, 131 F.3d 95, 97 (2d Cir. 1997) (quoting *Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997)).  Courts in New York consider the following factors in analyzing whether the corporate veil can be pierced because an alter ego relationship exists:

> (1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the degree of discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arms length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of the corporation's debts by the dominating entity, and (10) intermingling of property between the entities.

*In re Amaranth Nat. Gas Commodities Litig.*, 612 F. Supp. 2d 376, 384 (S.D.N.Y. 2009), *aff'd*, 730 F.3d 170 (2d Cir. 2013).  "[C]onclusory allegations of an alter ego are insufficient to survive a motion to dismiss."  *Kalin v. Xanboo, Inc.*, 526 F. Supp. 2d 392, 403 (S.D.N.Y. 2007) (internal citations omitted).

The complaint alleges that Ridge Hill and Ataraxia:

> share an office address, have an overlap in ownership and directors, including Sharad Sri and Asanth Sebastian, and personnel, and their owners, directors, and employees use Ataraxia email addresses to conduct business purportedly on behalf of Ridge Hill. Ataraxia purports to use the entity known as Ridge Hill to operate and conduct Ataraxia's personal protective equipment business, but does so with the assets and personnel of Ataraxia.  Upon information and belief, Ridge Hill and Ataraxia are not treated as independent profit centers, and funds are commingled between Ridge Hill and Ataraxia. Ridge Hill and Ataraxia, upon information and belief, do not deal with each other at arm's length, use each other's property as if it were their own, and pay and guarantee the debts of each other.  As such, Ridge Hill and Ataraxia are alter egos and Ataraxia dominated Ridge Hill with respect to its transaction and dealings with Plaintiff.

Doc. 56 ¶¶ 8, 80.

Ridge Hill argues that the overlapping personnel the complaint identifies, Sri and Sebastian, are not sufficient to establish an alter ego relationship.  *Id.*  It is true that overlapping

ownership and personnel alone cannot establish an alter ego relationship. *See In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 296 (S.D.N.Y. 2005); *In re Amaranth Nat. Gas Commodities Litig.,* 587 F. Supp. 2d 513, 538 (S.D.N.Y. 2008), *aff'd*, 730 F.3d 170 (2d Cir. 2013).  However, the complaint alleges more.  It also alleges that Ataraxia and Ridge Hill share offices and Ridge Hill employees use Ataraxia email addresses.  Doc. 56 ¶¶ 8, 80.  Shared offices and emails also do not independently establish alter ego liability, *see Amaranth*, 587 F. Supp. 2d at 386, but these are additional factors that can be considered and rise above the level of "conclusory allegations of an alter ego." *Kalin*, 526 F. Supp. 2d at 403.  The additional allegations that the two entities pay and guarantee each other's debts and commingle funds and property are further probative of alter ego status.

However, Remcoda also must sufficiently plead that Ataraxia dominated Ridge Hill and used that domination to injure Remcoda.  The only allegations in the complaint regarding domination are that "Ataraxia . . . [used] Ridge Hill to operate and conduct Ataraxia's personal protective equipment business . . . with the assets and personnel of Ataraxia . . . [and] Ataraxia dominated Ridge Hill with respect to its transaction and dealings with Plaintiff."  Doc. 56 ¶¶ 8, 80.  These conclusory allegations are not sufficient, as a plaintiff is required to plead "facts that would tend to show that [the defendant] used the close relationship to dominate [the alter ego]." *Parmalat*, 375 F. Supp. 2d at 297.  Additionally, there are no non-conclusory allegations that the domination led to Remcoda's alleged injury.  "Where the challenged complaint lacks this causative element — i.e., the use of domination to cause the injury, it should result in the dismissal of the corporate veil-piercing allegation." *VariBlend Dual Dispensing Sys. LLC v. Crystal Int'l (Grp.) Inc.*, No. 18 Civ. 10758 (ER), 2019 WL 4805771, at *18 (S.D.N.Y. Sept. 30, 2019) (internal quotation marks and citation omitted).  Therefore, Remcoda has not sufficiently

plead alter ego liability for Ataraxia, and Ridge Hill's motion to dismiss the claims against

Ataraxia is granted.  The Court need not address Ridge Hill's further argument that the complaint

fails to state a claim for breach of contract as to Ataraxia.

### ii.  Fraudulent Inducement

To state a claim for fraudulent inducement under New York law, a claimant must allege

that "(1) defendant made a representation as to a material fact; (2) such representation was false;

(3) defendant intended to deceive plaintiff; (4) plaintiff believed and justifiably relied upon the

statement and was induced by it to engage in a certain course of conduct; and (5) as a result of

such reliance plaintiff sustained pecuniary loss."  *Stephenson v. PricewaterhouseCoopers, LLP*,

482 F. App'x 618, 622 (2d Cir. 2012), *as amended* (June 13, 2012) (summary order) (internal

quotation marks and citation omitted); *Amida Capital Mgmt. II, LLC v. Cerberus Capital Mgmt.,*

*L.P.*, 669 F. Supp. 2d 430, 444 (S.D.N.Y. 2009) (stating that the fraudulent inducement elements

are similar to common law fraud elements).  In addition, "the Complaint must . . . state with

particularity the circumstances of the fraud under Rule 9(b) and contain sufficient facts, accepted

as true, to state claims for relief for common-law fraud that are facially plausible under Rule

8(a)(2)."  *Woori Bank v. RBS Sec., Inc.*, 910 F. Supp. 2d 697, 700–01 (S.D.N.Y. 2012).

Moreover, even where a fraud claim is sufficiently pled, "[u]nder New York law, no

fraud claim is cognizable if the facts underlying the fraud relate to the breach of

contract."  *Auerbach v. Amir*, No. 06 Civ. 4821 (RJD), 2008 WL 479361, at *5 (E.D.N.Y. Feb.

19, 2008) (internal quotation marks and citations omitted); *see also Kriegel v. Donelli*, No. 11

Civ. 9160 (ER), 2014 WL 2936000, at *13 (S.D.N.Y. June 30, 2014) ("Under New York law, a

fraud-based claim must be sufficiently distinct from a breach of contract claim . . . .") (internal

quotation marks and citation omitted).  The Second Circuit has instructed that where fraud

claims are brought alongside contract claims, the fraud claims may only proceed where plaintiff can "(i) demonstrate a legal duty separate from the duty to perform under the contract; (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." *Bridgestone/Firestone, Inc. v. Recovery Credit Servs. Inc.*, 98 F.3d 13, 20 (2d Cir. 1996) (internal quotation marks and citations omitted).  A party's mere promise to perform its contractual obligations, even if knowingly false at the time of making, is not enough to support a claim of fraud under New York law.  *See Bridgestone*, 98 F.3d 13 at 19.  A successful fraudulent inducement claim should be "premised on misrepresentations [of material fact] that were made before the formation of the contract and that induced the plaintiff to enter the contract."  *Cohen v. Koenig*, 25 F.3d 1168, 1173 (2d Cir. 1994) (internal citation omitted).  If a promise to take some future action is collateral to the terms of the contract itself, it can be considered a misrepresentation for the purposes of a fraudulent inducement claim.  *See Deerfield Comms. Corp. v. Chesebrough-Ponds, Inc.*, 502 N.E.2d 1003, 1004, 510 N.Y.S.2d 88 (N.Y. 1986) (finding that "a promise [not contained in the written agreement] made with a preconceived and undisclosed intention of not performing it . . . constitutes a misrepresentation" for purposes of a fraudulent inducement claim).

Remcoda argues that it has alleged a non-duplicative collateral fraudulent misrepresentation by alleging that Ridge Hill Defendants asserted that they had secured access to PPE that would meet Remcoda's requirements.  However, Remcoda does not explain how such misrepresentations are collateral when the agreement itself was entirely focused on the provision of PPE.  The facts in the instant case are distinguishable from a case like *Estrada v. Dugow*, 15 Civ. 3189 (ER), 2016 U.S. Dist. LEXIS 44284 (S.D.N.Y. Mar. 31, 2016), in which the defendant

made false representations regarding the financial health of a company to induce the plaintiff to invest, as that was a statement of present fact separate and apart from the purchase agreement to invest.  Here, the contract was for the purchase of PPE, so a representation about the inventory of PPE is not collateral.  *See Ithaca Cap. Invs. I S.A. v. Trump Panama Hotel Mgmt. LLC*, 450 F. Supp. 3d 358, 371 (S.D.N.Y. 2020) (finding that plaintiff's statements regarding a sales agreement were not collateral because the statements were false assurances that the plaintiffs intended to fulfill the contractual obligations).  Because the fraudulent inducement claim is duplicative of the breach of contract claim, Ridge Hill's motion to dismiss the claim is granted.

### iii.    Money Had and Received and Unjust Enrichment Claims

Under New York law, an action for money had and received lies when "(1) defendant received money belonging to plaintiff; (2) defendant benefitted from the receipt of money; and (3) under principles of equity and good conscience, defendant should not be permitted to keep the money."  *Aaron Ferrer & Sons Ltd. v. Chase Manhattan Bank*, 731 F.2d 112, 125 (2d Cir. 1984).  To state a claim for unjust enrichment under New York law, a plaintiff must provide proof that "(1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover."  *Briarpatch Ltd. v. Phx. Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004), *cert. denied*, 544 U.S. 949 (2005).  "The 'essence' of such a claim 'is that one party has received money or a benefit at the expense of another.'"  *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (quoting *City of Syracuse v. R.A.C Holding, Inc.*, 685 N.Y.S.2d 381, 381 (N.Y. App. Div. 1999)).

Ridge Hill argues that the complaint fails to allege any benefit or enrichment conferred upon Gunawardhana or Fletcher.[2]  The complaint only alleges that Remcoda paid the 50% deposit "to Ridge Hill."  Doc. 56 ¶ 44.  There is no allegation that Gunawardhana or Fletcher as individuals received money.  In response, Remcoda argues that it has properly pleaded this claim as it alleges that "Defendants . . . had already converted and misused Plaintiff's deposit for their own personal benefit."  *Id.* ¶ 65.  Its use of the plural is not sufficient to sustain the claim, especially when coupled with the explicit allegation that the money was sent to Ridge Hill alone. While the Court must draw all reasonable inferences in Remcoda's favor, the Court does not find that Remcoda has sufficiently alleged a claim of money had and received nor a claim of unjust enrichment against Gunawardhana or Fletcher.  Accordingly, Ridge Hill's motion to dismiss these claims as to Gunawardhana and Fletcher is granted.

### C.  Gross Motion to Dismiss

The amended complaint asserts three causes of action against Gross:  (1) fraudulent inducement to enter the agreement, Doc. 56 ¶ 74; (2) aiding and abetting Ridge Hill's fraud, *id.* ¶ 86; (3) money had and received (quasi-contract), *id.* ¶ 102; and (4) unjust enrichment (quasi-contract), *id.* ¶ 106.  Gross moves to dismiss the amended complaint for failure to state a claim. Doc. 76.

#### 1.  Incorporation of Procurement Agreement Into Complaint

Gross argues that his procurement agreement, Doc. 109-1, with Remcoda should be incorporated into the amended complaint by reference.

In deciding a motion to dismiss, the Court may consider documents that are "referenced in the complaint, documents that the plaintiffs relied on in bringing suit and that are either in the

---

[2] Ridge Hill argues the same for Ataraxia, but as the Court has now dismissed the claims against Ataraxia, the Court will not address those arguments.

plaintiffs' possession or that the plaintiffs knew of when bringing suit, or matters of which judicial notice may be taken." *Silsby v. Icahn*, 17 F. Supp. 3d 348, 354 (S.D.N.Y. 2014), *aff'd sub nom. Lucas v. Icahn*, 616 Fed. Appx. 448 (2d Cir. 2015) (summary order) (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)); *see also DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). To be incorporated into the complaint by reference, "the [c]omplaint must make a clear, definite and substantial reference to the documents." *Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 815 F. Supp. 2d 679, 691 (S.D.N.Y. 2011) (internal quotation marks and citation omitted).

Here, the complaint alleges that Gross is an "employee and/or agent of Ridge Hill," Doc. 56 ¶ 17, and references the terms of his procurement agreement with Remcoda to receive a 5% fee for any resultant transaction, *id.* ¶¶ 21–22. These are clear and substantial references to the procurement agreement, so the Court will consider the agreement, Doc. 109-1, to be incorporated by reference.

However, the Court notes that the terms of the procurement agreement, which speak to Gross's role as a procurement agent introducing Remcoda to Ridge Hill, do not and cannot fully address the scope of Gross's alleged relationship with Ridge Hill. Even if the procurement agreement definitively stated that Gross was no more than a passive agent, it would still be possible that Gross engaged in a fraudulent scheme with Ridge Hill outside the bounds of the procurement agreement. The Court will resolve doubts in favor of Remcoda.

### 2. Fraudulent Inducement

As stated above, to state a claim for fraudulent inducement under New York law, a claimant must allege that "(1) [the defendant] made a representation as to a material fact; (2) such representation was false; (3) [the defendant] intended to deceive; (4) [plaintiff] believed and

justifiably relied upon the statement and was induced by it to engage in a certain course of conduct; and (5) as a result of such reliance [plaintiff] sustained pecuniary loss[.]" *Stephenson*, 482 F. App'x at 622 (internal citation omitted); *Amida*, 669 F. Supp. 2d at 444 (stating that the fraudulent inducement elements are similar to common law fraud elements).  To adequately plead fraud, the plaintiff must plead fraudulent intent through "facts that either (1) show that the defendant had both the 'motive and opportunity' to commit the alleged fraud, or (2) 'constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" *Minnie Rose LLC*, 169 F. Supp. 3d at 511–12 (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290–91 (2d Cir. 2006).  Lastly, a claim for fraudulent inducement can only be sustained if "the person making the representations [is], or [is] acting on behalf of, the other party to the contract." *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Worley*, 690 N.Y.S.2d 57, 61 (N.Y. App. Div. 1999).

   Gross argues that the fraudulent inducement claim against him should be dismissed because he is not a party to the agreement to provide gloves.  Gross is not a party to the agreement – Remcoda's agreement was with Ridge Hill alone, and there is no evidence that Gross is an employee of Ridge Hill.  Doc. 56 ¶ 39.  However, Remcoda argues that Gross can still be liable for fraudulent inducement as an agent acting on behalf of Ridge Hill.  Doc. 111 at 20.  Remcoda argues that it has properly pleaded that Gross is an agent of Ridge Hill by alleging that Gross twice represented that Ridge Hill could immediately provide gloves, Doc. 56 ¶ 23, 29,[3] and by alleging that Gross was working with the other defendants from the start to defraud

---

[3] Remcoda's allegations regarding Gross's communications and representations after the agreement was already entered are not relevant to this claim for fraudulent inducement of the contract.  *See PetEdge, Inc. v. Garg*, 234 F. Supp. 3d 477, 492 (S.D.N.Y. 2017) ("pre-contractual conduct . . . is the only conduct that is relevant to the fraudulent inducement claim").  Remcoda's citations to *Jordan Inv. Co. v. Hunter Green Invs.*, No. 00 Civ. 9214 (RWS), 2003 U.S. Dist. LEXIS 5182 (S.D.N.Y. Mar. 31, 2003) and *Minnie Rose LLC v. Yu*, 169 F. Supp. 3d 504, 520 (S.D.N.Y. 2016) are inapposite, as those cases addressed claims for fraud and not fraudulent inducement, a separate claim with a necessarily temporal component.

Remcoda, *id.* ¶ 71.  Doc. 111 at 21–22.  The Court agrees with Remcoda and finds that it has sufficiently alleged that Gross was acting as an agent of Ridge Hill.  Therefore, he can be subject to a claim for fraudulent inducement.

Remcoda also argues that it has sufficiently alleged the elements of fraudulent intent.  It alleges that after it agreed to Gross's 5% fee, he represented that Ridge Hill "would be able to immediately provide" the gloves.  Doc. 56 ¶ 23.  Later, it alleges that Gross stated that he was working with Gunawardhana, Fletcher, and others to figure out financing and payment and confirmed that the gloves could be provided immediately.  *Id.* ¶¶ 29, 32.  It alleges that Gross "urged [it] to move forward with the transaction with Ridge Hill."  *Id.* ¶ 32.  It further alleges that "these representations were false and Gross . . . knew they were false," *id.* ¶ 36, and "Defendants . . . intended to enrich themselves . . . with Gross receiving his 5% fee from Defendants, without ever providing the product . . . ."  *Id.* ¶ 37.  Finally, it alleges that it relied on these representations to enter into the agreement with Ridge Hill, ultimately leading to its financial losses.  *Id.* ¶¶ 39, 72.

Gross, however, argues that there is no evidence that he knew the alleged statements he made were false other than the fact that the contract was not fulfilled, a type of "fraud by hindsight" claim that courts reject.  Doc. 108 at 21.  For example, in *Coppelson v. Serhant*, No. 19 Civ. 8481 (LJL), 2021 WL 148088, at *8 (S.D.N.Y. Jan. 15, 2021), the court dismissed a fraudulent inducement claim because there were no allegations of fact supporting the falsity of the representations at issue.  While Remcoda argues that *Coppelson* is distinguishable because the representations at issue concerned real property values which the court found to be "matters of opinion," *id.* at *7, the *Coppelson* court did conclude independently of that analysis that falsity by hindsight is not actionable.  *Id.* at *8.  Additionally, the Second Circuit has made clear that to

satisfy Rule 9(b), a plaintiff must "explain why the statements were fraudulent." *Rombach v.*
*Chang*, 355 F.3d 164, 172 (2d Cir. 2004) (internal quotation marks and citation omitted).  In
response, Remcoda argues that it has not alleged fraud by hindsight because it has alleged a
common fraudulent scheme between Gross and Ridge Hill with Gross serving as its agent who
made "allegations of misrepresentations of then-existing fact that Gross knew to be false,"
including his representations regarding the availability of the gloves and Ridge Hill's experience
in the PPE market.  Doc. 111 at 23.  Remcoda also highlights its pleadings regarding Gross's
intent, as he was to receive a 5% fee.

The Court finds that allegations regarding the fee are sufficient to establish motive and
opportunity to defraud, leading to an inference of fraudulent intent.  *See Minnie Rose*, 169 F.
Supp. 3d at 518 (finding that plaintiff's ability to enrich themselves through the alleged fraud
constituted concrete and personal benefit from which scienter could be inferred).  Taken
together, Remcoda's specific allegations regarding Gross's representations, its allegations that
Gross was an agent of Ridge Hill engaged in a common fraudulent scheme, and its allegations
regarding the personal and concrete benefit Gross would receive in the form of a 5% fee are
sufficient to satisfy Rule 9(b) and the elements of a fraudulent inducement claim at the motion to
dismiss stage.  Remcoda's agreement with Ridge Hill does not alter this conclusion.  The
agreement clearly states that, although there were delays "caused by [verifying bodies] due to the
pandemic," "stock is readily availble [sic]," and "stock [was] ready by 31 July."  Doc. 83-2 at 3.
Acknowledging possible delays would not change the outcome in instant motion, as ultimately
this representation is similar to the ones that the gloves would be ready by the agreed-upon
delivery date of July 31.  Accordingly, Gross's motion to dismiss the claim for fraudulent
inducement against him is denied.

### 3. Aiding and Abetting Fraud

"To establish liability for aiding and abetting fraud under New York law, 'the plaintiffs must show (1) the existence of a fraud; (2) [the] defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission.'" *Krys v. Pigott*, 749 F.3d 117, 127 (2d Cir. 2014) (quoting *Lerner*, 459 F.3d at 292). The defendant's knowledge of the fraud must be actual, not constructive knowledge, "as discerned from the surrounding circumstances." *Id.* (internal quotation marks and citation omitted). The defendant thus need not explicitly acknowledge the fraud, but the knowledge must be able to be inferred from the allegations in the complaint. *Id.*

The same allegations supporting the fraudulent inducement claim support the aiding and abetting fraud claim. Gross repeats his arguments that Remcoda has not sufficiently alleged knowledge of falsity, reliance, and intent to defraud. As the Court has concluded that the fraudulent inducement claim satisfies Rule 9(b), the Court concludes the same for the aiding and abetting claim. Gross's motion to dismiss this claim is thus denied.

### 4. Money Had and Received and Unjust Enrichment

The legal standards for the quasi-contractual claims for money had and received and unjust enrichment are stated above, *supra* Section B(2)(iii). "[R]ecent decisions in New York state courts and this District have found that the existence of a valid and binding contract governing the *subject matter* at issue in a particular case precludes a claim for unjust enrichment even against a non-signatory to that agreement." *In re Stillwater Asset Backed Offshore Fund Ltd.*, No. 16 Civ. 8883 (ER), 2018 WL 1610416, at *13 (S.D.N.Y. Mar. 30, 2018), *aff'd sub nom. Stillwater Liquidating LLC v. Net Five at Palm Pointe, LLC*, 777 F. App'x 16 (2d Cir.

2019) (alteration in original) (citing *Law Debenture v. Maverick Tube Corp.*, No. 06 Civ. 14320 (RJS), 2008 WL 4615896, at *12 (S.D.N.Y. Oct. 15, 2008) (collecting cases)).

The first element of a claim for money had and received is that the defendant received money belonging to the plaintiff.  *See Aaron Ferrer*, 731 F.2d at 125.  Similarly, the first two elements for unjust enrichment are that the defendant was enriched at plaintiff's expense. *Briarpatch Ltd.*, 373 F.3d at 306.  Gross argues that Remcoda has not adequately alleged that Gross was enriched at plaintiff's expense.  The complaint does allege that "Defendants" paid Gross the 5% fee, Doc. 56 ¶¶ 37, 71, but Gross argues that this is an allegation unsupported by any facts.

To survive a motion to dismiss, a plaintiff must provide a factual basis and not simply conclusory allegations.  *See Welch v. TD Ameritrade Holding Corp.*, No. 07 Civ. 6904 (RJS), 2009 WL 2356131, at *52 (S.D.N.Y. July 27, 2009).  Remcoda does not respond to this argument.  The unsupported allegations that Gross received money from other Defendants cannot sustain these claims.  Accordingly, Gross's motion to dismiss these two claims is granted.[4]

## IV.    CONCLUSION

For the foregoing reasons:

- The Petrichor Defendants' motion to dismiss is GRANTED.

- The Ridge Hill Defendants' motion to dismiss as to improper service is DENIED, and the motion to dismiss as to fraudulent inducement is GRANTED.

- The motion to dismiss Ataraxia is GRANTED.

---

[4] As the Court is dismissing these claims, it need not address Gross's further arguments that the claims should be dismissed as duplicative of the breach of contract claim.

- The motion to dismiss the money had and received and unjust enrichment claims against Gunawardhana and Fletcher is GRANTED.

- Gross's motion to dismiss the money had and received and unjust enrichment claims is GRANTED, and the motion to dismiss the fraudulent inducement and aiding and abetting fraud claims is DENIED.

Ataraxia, Petrichor Malaysia, Petrichor UK, Nateshan, Vaidyanathan, Gunawardhana, and Fletcher are dismissed from this case.  Defendants Ridge Hill Trading (PTY) LTD and Gross remain.

The Clerk of Court is respectfully directed to terminate the motions, Docs. 76, 82, and 107.

It is SO ORDERED.

Dated:   March 1, 2022
       New York, New York

                                                 Edgardo Ramos, U.S.D.J.