UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

REMCODA, LLC,

                            Plaintiff,

                – against –

RIDGE HILL TRADING (PTY) LTD, ATARAXIA
CAPITAL PARTNERS PTY LTD, and RUSSELL
GROSS,

                         Defendants.

**OPINION AND ORDER**

21 Civ. 979 (ER)

Ramos, D.J.:

      Remcoda, LLC filed this action on February 3, 2021, alleging that defendants engaged in a fraudulent scheme in which they contracted to provide nitrile gloves during the COVID-19 pandemic and never performed.  Doc. 1.  Remcoda filed an amended complaint on June 30, 2021 (the "FAC"), Doc. 56, and a second amended complaint (the "SAC") on April 25, 2022, Doc. 140.  On June 30, 2022, Ataraxia Capital Partners moved to dismiss the SAC in its entirety for failure to plead alter ego liability against it, pursuant to Federal Rule of Civil Procedure 12(b)(6).  Doc. 153.  That same day, Russell Gross filed a separate motion to dismiss the SAC for lack of subject matter jurisdiction and failure to state a claim, pursuant to Rules 12(b)(1) and (6).  Doc. 155.  For the reasons set forth below, the motion of Gross is DENIED in part and GRANTED in part.  Specifically, the aiding and abetting fraud claim is dismissed, while the fraudulent inducement claim survives.  The motion of Ataraxia is DENIED.

## I.   BACKGROUND[1]

### *The Parties*

Remcoda is a New York limited liability company, whose sole member, Marc Garson, was a citizen of Florida at the time Remcoda commenced this action.  ¶ 5; the July 28, 2022 Declaration of Marc Garson ("Garson Decl."), Doc. 165-1, ¶ 1.  At all relevant times, Remcoda maintained a principal place of business in New York.  *Id.*  Gross is an individual residing in New York and an alleged agent of Ridge Hill.[2]  ¶ 9.  Ridge Hill and Ataraxia are Australian companies that have separate offices in Melbourne, Australia and also share an office in Colombo, Sri Lanka.  ¶ 6.  Ridge Hill was formed in August 2019, while Ataraxia is over ten years old and has 110 full-time employees, with other offices around the world.  ¶¶ 30, 38.  With respect to the relationship between Ridge Hill and Ataraxia, the SAC alleges that

> Ridge Hill and Ataraxia . . . share an office address, have an overlap in ownership and directors, including Sharad Sri and Asanth Sebastian, and personnel, and their owners, directors, and employees use Ataraxia email addresses to conduct business purportedly on behalf of Ridge Hill.  Ataraxia purports to use the entity known as Ridge Hill to operate and conduct Ataraxia's personal protective equipment business, but does so with the assets and personnel of Ataraxia. . . . Ridge Hill and Ataraxia are not treated as independent profit centers, and funds are commingled between Ridge Hill and Ataraxia.  Ridge Hill and Ataraxia . . . do not deal with each other at arm's length, use each other's property as if it were their own, and pay and guarantee the debts of each other.  In short, Ridge Hill and Ataraxia are alter egos and Ataraxia dominated Ridge Hill with respect to its transaction and dealings with [Remcoda].

¶ 8.[3]

---

[1] The following facts are based on the allegations in the SAC, which the Court accepts as true for purposes of the instant motion.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  Unless otherwise noted, citations to "¶ __" refer to the SAC, Doc. 140.

[2] Gross is also a partner in a personal protective equipment ("PPE") brokerage firm named Unicorn Health LLC ("Unicorn").

[3] The SAC also discusses former parties, collectively referred to as the "De Raj Parties."  ¶ 53 n. 1.  De Raj Group AG ("De Raj") is a German stock corporation with offices in Malaysia and Germany.  ¶ 10.  Petrichor Capital SDN BHD ("Petrichor Malaysia") is a company with a principal place of business in Malaysia.  ¶ 11.  Petrichor Capital Trading Limited ("Petrichor UK") is a company with an office in the United Kingdom.  ¶ 12.  Vaidyanathan

*The Nitrile Glove Venture*

During the COVID-19 pandemic in the summer of 2020, Remcoda agreed to provide

nitrile examination gloves for use as PPE to two of the largest food distribution companies in the

United States.  ¶ 19.  In early June 2020, Gross, on behalf of a Unicorn, represented to Remcoda

that he had extensive experience selling PPE and that he had proprietary manufacturing and

supply relationships in the PPE industry.  ¶ 21.  On June 8, 2020, Remcoda and Unicorn entered

into a procurement agreement (the "Procurement Agreement"), which provided in relevant part

that Remcoda would engage Unicorn's services to procure the gloves in exchange for a payment

of 5% of the purchase price for each transaction consummated with a covered supplier.  Doc.

156-15 at 2.  Gross signed the Procurement Agreement as a partner in Unicorn.  *Id.*

In accordance with the procurement agreement, Gross then introduced Remcoda to

Menusha Gunawardhana and Vincent Fletcher[4] at the beginning of June 2020.[5]  ¶ 22.  Gross

---

Mulandram Nateshan is the CEO of De Raj and a director of Petrichor Malaysia and Petrichor UK.  ¶ 13.  Gayathri
Vaidyanathan, the wife of Nateshan, is a shareholder of De Raj and a director of Petrichor Malaysia and Petrichor
UK.  ¶ 14.  Nateshan and Vaidyanathan reside in India.  ¶¶ 13–14.  De Raj, Petrichor Malaysia, and Petrichor UK
are jointly controlled by Nateshan and Vaidyanathan, and the entities transfer assets between one another.  ¶¶ 13–14,
70.  The FAC named each of the De Raj Entities as defendants.  Doc. 56.  The Court, however, dismissed Petrichor
Malaysia, Petrichor UK, Nateshan, and Vaidyanathan in an opinion issued on March 1, 2022.  Doc. 131.  Remcoda
dropped De Raj as a defendant in the SAC.  Doc. 140.

[4] Gunawardhana and Fletcher were initially named defendants but have since been dismissed from this action.  *See
id.*

[5] The declaration of Robert Anello in support of Gross' motion to dismiss (the "Anello Declaration"), Doc. 156,
attaches a copy of three documents, which show that Gross connected Remcoda to Ridge Hill on June 9, 2020.
These documents include:  (1) a June 9, 2020 email from Gross to a Gunawardhana, in which Gross promised to
"connect everyone over email and [W]hats[A]pp," Doc. 156-24; and (2) the ensuing WhatsApp thread, connecting
Remcoda to Fletcher and Gunawardhana, Doc. 156-25, and (3) email exchange, also connecting Remcoda to
Fletcher and Gunawardhana, Doc. 156-26.  In considering a motion to dismiss, a district court "can consider the
facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by
reference in the complaint."  *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (citing *Chambers v.
Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)).  For a document to be incorporated by reference, "the
complaint must make 'a clear, definite, and substantial reference to the document[].'" *DeLuca v. AccessIT Grp.,
Inc.*, 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010) (quoting *Helprin v. Harcourt, Inc.*, 277 F. Supp. 2d 327, 330–31
(S.D.N.Y. 2003)).  As the SAC expressly refers to Gross introducing Remcoda to Ridge Hill, *see* ¶ 22, the Court
takes judicial notice of these documents.

described Gunawardhana and Fletcher as agents of Ridge Hill, a company that would be able to immediately provide Remcoda with the examination gloves. *Id.* A series of emails and text-messages ensued. ¶ 23. Gunawardhana and Fletcher advised Remcoda that they had substantial experience and expertise in procuring PPE from international sources. *Id.* Gunawardhana and Fletcher referred to their employer as "Ridge Hill/Ataraxia" and told Remcoda that they could "guarantee" a prompt supply of the gloves because Ridge Hill/Ataraxia enjoyed a close relationship with a "local joint venture partner[,] Vina Capital," along with "direct access" to factories.[6] *Id.*; *see also* Doc. 156-19.

Based on these representations, Remcoda began to negotiate a deal with Gunawardhana and Fletcher for the nitrile gloves. ¶ 24. Remcoda advised Gross, Gunawardhana, and Fletcher that it required black and blue gloves in specific sizes and that it needed the gloves to be delivered by July 31, 2020. ¶ 25. At this time, Remcoda believed Ridge Hill to be one with, and the same as, Ataraxia. ¶ 24. On June 10, 2020, Gunawardhana added two other individuals to the email thread with Remcoda: Sharad Sri and Asantha Sebastian. ¶ 26. Gunawardhana identified Sri and Sebastian as "the directors at [Ridge Hill.]" *Id.* Remcoda also understood them to be directors of Ataraxia, as each of their email addresses used the domain "@ataraxiacaptialpartners.com." *Id.*

Throughout June 2020, the negotiations continued, and Sri and Sebastian remained continually involved. ¶ 26. On June 29, 2020, Gross informed Remcoda that he was working

---

[6] The Anello Declaration attaches a copy of a June 9, 2020 email from Gunawardhana to Remcoda in which she describes "[Ridge Hill/Ataraxia's] relationship . . . [with] local joint venture partner Vina Capital[,] who [is] one of the largest and most prominent companies and asset managers in Vietnam," in order to "give . . . some reassurance that [Ridge/Hill Ataraxia would] be able to del[i]ver as per schedule." *See* Doc. 156-19. The SAC references this communication. *See* ¶ 23 (alleging that in a series of communications beginning June 9, 2020, Gunawardhana represented that Ridge Hill/Ataraxia had a helpful relationship with a joint venture partner, Vina Capital). The Court therefore takes notice of this document. *See DiFolco*, 622 F.3d at 111.

with Gunawardhana and Fletcher to determine the specifics for financing the transaction.  ¶ 28. The following day, in a June 30, 2020 email (the "June 30 Email") to an individual named Jackson Barber, on which Gross was copied,[7] Gunawardhana stated that "Ridge Hill Trading [], Vogue Tex [], and Ataraxia Capital [] ma[de] up three arms of a [f]amily group" and that he and Fletcher "front[ed] the business," while Sri and Sebastian were "on the supply chain[.]"[8]  ¶ 29. Gunawardhana further informed Gross that Sri and Sebastian were "owners and partners within the [f]amily group" and that the "[f]amily group [was able to] offer the connections, financial scale, controls, and experience that most in the PPE market [could not provide]," because of the "investor partnerships" and joint ventures of Ridge Hill and Ataraxia.[9]  *Id.*  Shortly thereafter, Gross relayed this information to Remcoda during a telephone call, advising that Ataraxia, through Sri and Sebastian, would handle fulfillment of the purchase order and assuring Remcoda that it "was not dealing with a 'fly by night' operation."  ¶ 30.

On that call, Gross also informed Remcoda that the "Ataraxia Capital/Ridge Hill" was open to pre-funding proposals for PPE orders.  *Id.*  And Fletcher advised Remcoda that Ridge Hill might be interested in financing the glove order, but that he was waiting for his Ridge Hill/Ataraxia Capital colleagues to confirm.  ¶ 30.  Remcoda thereafter advised a separate

---

[7] The Anello Declaration attaches a copy of this June 30, 2020 email, which was sent by Gunawardhana to Jackson Barber (identified by Gross as "a non-party and unrelated potential client of Ridge Hill," *see* Anello Decl. ¶ 26), copying Fletcher and Gross.  *See* Doc. 156-29.  The Court takes judicial notice of this document as incorporated into the SAC by reference, *see* ¶ 30 ("In a June 30 2020 email to Gross, Gunawardhana claimed that . . .").  *DiFolco.*, 622 F.3d at 111.

[8] The SAC does not provide any detail regarding to the role of Vogue Tex in the "family group's" dealings with Remcoda.  Doc. 140.

[9] The SAC does not provide any additional details with respect to any of the alleged joint ventures or partnerships of Ridge Hill and Ataraxia.  *Id.*

"potential financing company" that Ridge Hill/Ataraxia was considering pre-funding the purchase order in an effort to "emphasiz[e] the stability of its source of gloves[.]"[10]  ¶ 32.

Ultimately, however, on July 9, 2020, Gunawardhana informed Remcoda that Ridge Hill would require a 50% deposit for the gloves, with the balance to be paid *after* an independent third party inspected the goods before delivery.  ¶ 34.  At that time, Gunawardhana also stated that the gloves would be delivered "7-10 working days after deposit."  *Id.*  On July 13, 2020, Gunawardhana told Remcoda that the company would "ensure [its] money [was] secure."  ¶ 37. The following day, Gunawardhana stated that "all [was] ok with stock."  ¶ 37; Doc. 156-23.[11]

On July 15, 2020, Gunawardhana emailed a "corporate offer" to Remcoda (the "Corporate Offer"), which was extended on behalf of "Ridge Hill Trading ([p]art of Ridge Hill Group of Companies, Ataraxia Capital Partners)[.]"  ¶ 38; *see* Doc. 83-2.[12]  The Corporate Offer was on Ridge Hill letterhead and signed by Sharad Sridharan, as a director of Ridge Hill Trading Pty Ltd.[13]  Doc. 83-2 at 2, 5.  Moreover, the Corporate Offer reflected that Ridge Hill had an office in Colombo, Sri Lanka, at the same address as the office listed on Ataraxia's website.  *Id.* at 2; ¶ 43.  The offer was to deliver 1.3 million black and blue nitrile gloves in specific sizes by July 31, 2020 for $9,261,748, which Remcoda would pay for in two 50% installments.  Doc. 83-2 at 2–3; ¶¶ 43, 47.

---

[10] The SAC does not identify this financing company.  *Id.*

[11] The Anello Declaration attaches a copy of the July 14, 2020 WhatsApp thread in which Gunawardhana advised that "all [was] ok with stock."  *See* Doc. 156-23.  As the SAC expressly references this communication, *see* ¶ 37, the Court takes notice of it.  *See DiFolco*, 622 F.3d at 111.

[12] Ridge Hill provides a copy of the Corporate Offer, Doc. 83-2, of which the Court takes judicial notice, as incorporated into the SAC.  *DiFolco.*, 622 F.3d at 111.

[13] The SAC does not mention an individual named Sharad Sridharan but as noted, discusses at length a "Sharad Sri." The Court presumes these names refer to the same person.

The following day, on July 16, 2020, Gunawardhana again informed Remcoda that Ridge Hill had secured sufficient stock of the black gloves, and Fletcher also advised that both the black and blue gloves were in stock and available for delivery.[14] ¶ 39.  Remcoda signed the Corporate Offer, thereby entering into a purchase agreement with Ridge Hill (the "Purchase Agreement").  ¶ 43; Doc. 83-2 at 5.  To finance the purchase, Remcoda procured a loan from an asset-based lender at an interest rate of 24% per annum.  ¶ 42.  On July 16, 2020, Ridge Hill provided a commercial invoice to Remcoda, which was consistent with the terms of the Purchase Agreement.  ¶ 47.  Four days later, on July 20, 2020, Remcoda made its first payment in the amount of $4,630,874, 50% of the purchase price.  ¶ 48.  Over the next six weeks, despite repeated assurances, the gloves were never delivered.  Also during this period, Ridge Hill made repeated requests for Remcoda to pay the balance of the contract.

### The Failure to Perform

On July 23, 2020, Gunawardhana sent Remcoda photographs of boxes of gloves, and on July 27, 2020, he told Remcoda that all the stock had been allocated and had passed inspection. ¶ 50.  On the same day, Gunawardhana demanded that Remcoda pay the balance of the purchase price, $4,630,874, but Remcoda refused.  ¶ 51.

On July 28, 2020, Gross, vouching for Ridge Hill, reiterated to Remcoda that Ridge Hill and Ataraxia were part of a "family group" and that "mutual owners" were managing the PPE supply chain.  *Id.* ¶ 52.  That same day, Gunawardhana forwarded Remcoda an email from an individual named Gayathri Vaidyanathan—a shareholder of De Raj, ¶ 14—claiming that "government intervention" in Vietnam had delayed the order but that De Raj would use its

---

[14] Remcoda asserts that although it did not know it at the time, these representations were false, and "Gross, Gunawardhana, Fletcher, and Ridge Hill knew that they were false."  ¶ 40.

connections to make the gloves ready for delivery shortly. ¶ 53. This email further provided that the goods would be shipped on August 8, 2020. *Id*.

Remcoda did not receive the gloves by the agreed delivery date of July 31, 2020. ¶ 54. On that date, Gunawardhana told Remcoda that Ridge Hill did not have black gloves as agreed but could instead provide additional blue gloves. ¶ 55. Due to time constraints, Remcoda agreed to accept the blue gloves. ¶ 56.

On August 2, 2020, Gunawardhana emailed Remcoda claiming that the deposit had been used up and that Remcoda would have to pay the second installment of $4,630,874 immediately. *Id*. ¶ 57. On the same date, in an attempt to unilaterally *increase* the purchase price set by the Purchase Agreement, Fletcher demanded that Remcoda make an immediate payment of $11 million in exchange for delivery of the gloves by the end of August.[15] Remcoda refused and demanded the gloves be delivered immediately. ¶ 60. Gunawardhana then assured Remcoda that the gloves would be delivered in two shipments on August 13 and 15, 2020. ¶ 61. On August 3, 2020, Gunawardhana told Remcoda that an inspection had been booked and that the report was forthcoming. *Id.* Around this time, Ridge Hill disclosed to Remcoda that it had been working with the husband of Gayathri Vaidyanathan, Vaidyanathan Mulandram Nateshan, and the De Raj Entities to fulfill its obligations under the Purchase Agreement. ¶ 62.

### *Termination of the Purchase Agreement*

By August 25, 2020 Remcoda had still not received the gloves. ¶ 68. Accordingly, Remcoda sent a letter to Ridge Hill and the De Raj Entities, terminating the Purchase Agreement, and demanding repayment of the 50% deposit. ¶ 68. On August 27, 2020,

---

[15] *See* ¶ 58 ("[O]n August 2, 2020, Fletcher brazenly attempted to increase the [Purchase] Agreement's purchase price and demanded that [Remcoda] immediately pay a total of $11 million to receive the gloves by the end of August[.]").

Vaidyanathan sent a letter to Remcoda as a director of Petrichor Malaysia with the subject line "Acceptance for refund of funds paid for purchase of [n]itrile [g]loves." ¶ 70. In the letter, Vaidyanathan confirmed that Petrichor Malaysia was "a related company" to De Raj and Petrichor UK and promised to "refund the amount paid for the supply of [n]itrile powder free gloves from Vietnam on [free on board] basis." *Id.* The letter further explained that the funds had been transferred to Petrichor UK, but Petrichor Malaysia would return the funds. *Id.* She also stated that they would "be using [their] group resources to make this refund" immediately. *Id.*

On September 2, 2020, Remcoda received a partial refund of $1 million from Petrichor UK, followed by an additional $1 million payment from Petrichor Malaysia on September 15, 2020. ¶ 71. On October 26, 2020, Petrichor Malaysia transferred $200,000 to Ridge Hill which it then transferred to Remcoda. ¶ 72. In a letter dated October 31, 2020, Nateshan wrote to Ridge Hill as "Group Chief Executive Officer" for Petrichor UK to confirm that De Raj would refund the remaining $2,430,836.65 according to the following payment schedule: $450,000 on November 16, 2020; $550,000 on November 27, 2020; $600,000 on December 11, 2020; $450,000 on December 18, 2020; and $380,836 on December 30, 2020. ¶ 73. Remcoda never received any of these payments. ¶ 74. In total, Remcoda is owed $2,430,836.65 of its original deposit. ¶ 73. Remcoda further alleges that as a result of defendants' conduct, it was unable to meet its commitments to provide nitrile gloves to its customers and lost profits in the amount of at least $676,040. ¶ 76. Additionally, Remcoda has been unable to repay the lender that financed the purchase order; as of April 25, 2022, the date the SAC was filed, Remcoda has accrued $650,00 in interest payments, which continues to accrue. *Id.*

### *The Residence of Marc Garson*

Marc Garson is the sole member of Remcoda.  In the fall of 2020, Garson and his wife decided to relocate from New York to Florida "to determine whether [Florida] would be a good long-term fit."  Garson Decl. ¶¶ 4–5.  Many aspects about Florida attracted Garson, including its good weather, business-friendly environment, limited COVID-19 restrictions, and low tax burden.  *Id.* ¶ 4.   In October 2020, Garson and his wife left the New York apartment where he had lived for the prior 25 years and entered into a short-term, seven-and-a-half month lease for an apartment in Sunny Isles, Florida.  *Id.* ¶ 6.  Garson opted for a short-term lease so that he and his wife would have the option to return to New York quickly in the event that they were not satisfied with life in Florida.  *Id.*

Since departing New York in October 2020, Garson has not rented or owned a residence anywhere other than Florida, except for a brief vacation rental in the Hamptons during the summer of 2021.  *Id.* ¶ 7.  He has spent in excess of 80% of his time in Florida.  *Id.*  Similarly, since October 2020, he has worked from his home in south Florida and not from New York.  ¶ 8.  His utility bills from the Florida Power & Light Company for his home address are also in the name of Remcoda, LLC, as reflected in statements from 2021 and 2022.  *See* Doc. 165-2.

Garson did not pay New York state taxes for 2021 and did not anticipate paying New York state taxes for 2022.  ¶ 8.  Florida does not impose a state income tax, but Garson and his wife submitted a request for an extension to file their federal income taxes for the 2021 tax year, which reflects their Florida address.  Doc. 156-13.

Shortly after moving to Florida, Garson and his wife joined North Miami Beach Tennis Center to meet members of their new community and to establish a new social circle in south Florida.  Garson Decl. ¶ 9.  Over the subsequent months, he and his wife came to love Florida, so

much so that by the end of January 2021, they were "in deep discussions concerning living there permanently." *Id.* ¶ 10.

By February 1, 2021, they decided that they wanted to remain in Florida permanently. *Id.* ¶ 11. At that point, they had no intentions of returning to live in New York or moving anywhere else, and they gave up all connections to New York. *Id.* ¶¶ 11, 23. Accordingly, Garson updated the Citibank account that he held jointly with his wife to reflect their Florida mailing address. *Id.* ¶ 12; *see also* Doc. 165-3 (bank statements reflecting a New York address for January 2021 and a Florida address for February 2021). This was the only bank account that Garson maintained at this time. Garson Decl. ¶ 13 (noting that "[there was no need for [him] to find a new bank" because Citibank "is a large bank with a nationwide presence, including in south Florida," and "conduct[ed] virtually all of [his] transactions online"). Also around this time, Garson investigated the procedure for registering their vehicles in Florida and updating their driver's licenses. However, because the Florida Department of Highway Safety and Motor Vehicles offered "limited in-office services," as a result of the COVID-19 pandemic, *see* Doc. 165-3, Garson and his wife were unsuccessful in attempting to schedule an appointment.[16] Garson Decl. ¶ 14.

Given that they were still new to south Florida, and because the local housing market was experiencing a boom, on March 23, 2021 Garson and his wife decided to sign a new, full-year lease on their apartment so that they had more time to analyze the housing market and find a permanent home. *Id.* ¶¶ 15–16. By December 5, 2021, Garson and his wife found a home located in Sunny Isles Beach that met their needs and offered to purchase the home on December

---

[16] Garson and his wife eventually scheduled an appointment to change their licenses and registrations for September 16, 2022. Garson Decl. ¶ 14.

4, 2021. *Id.* ¶ 17; *see also* Doc. 165-5 (accepted offer). They closed on the purchase of this home on April 4, 2022. Garson Decl. ¶ 17; *see also* Doc. 156-14 (closing statement).

Since moving to Florida, Garson has found a new physician and dentist and has not been treated by any physician or dentist since October 2020. Furthermore, Garson was an inactive voter in New York and has not registered to vote in Florida because "there has not yet been an election in which [he has] wanted to vote." Garson Decl. ¶ 21; *see also* Doc. 165-6 (a copy of the "VoterLookUp" website maintained by the New York State Board of Elections, which shows Garson's voting status as "inactive"). Garson's LinkedIn page identifies his location as New York, but Garson claims that he is not an active user of LinkedIn and was not aware of this fact until it was brought to his attention through Gross' motion. Garson Decl. ¶ 22.

### The SR3D Action

On January 27, 2021—at the time that Garson claims that he and his wife were "in deep discussions concerning living [in Florida] permanently," but before they decided to remain in Florida permanently on February 1, 2021, Garson Decl. ¶¶ 10–11—Remcoda filed a separate action in this District before Judge Lorna G. Schofield, captioned *Remcoda, LLC v. SR3D Int. Holdings Corp.*, 21 Civ. 756 (the "SR3D Action"). The action did not involve a federal question; like the instant action, jurisdiction was premised on diversity.

On February 24, 2021, because the *SR3D* complaint did not specify the citizenship of the members of Remcoda, the court ordered Remcoda to "file a letter including a brief statement as to the basis of subject matter jurisdiction," and specifying the citizenship of each of its members. Doc. 156-1. In response, on March 1, 2021, counsel for Remcoda, Attorney Elizabeth Uphaus of the firm Oved & Oved LLP—who also represents Remcoda in the instant action—wrote to the court, advising:

12

> [Remcoda] is a New York limited liability company with one member, Mark Garson, who is a resident and citizen of *New York*.  Defendant . . . is a *Florida* corporation with a principal place of business in . . . Florida.  Thus, this Court has subject matter jurisdiction over this action Pursuant to 28 U.S.C. Sec. 1332 because [p]laintiff and [d]efendant are domiciled in different states, and the amount in controversy exceeds $75,000.

*See* Doc. 156-2 (emphasis added).  Pursuant to these representations, Judge Schofield allowed the suit to proceed on the basis of diversity jurisdiction and ultimately entered a default judgment against SR3D.

### *Procedural History*

Remcoda brought the action on February 3, 2021, Doc. 1, and filed the FAC on June 30, 2021, Doc. 56.  Formerly named defendants, Petrichor Malaysia, Petrichor UK, Nateshan, and Vaidyanathan moved to dismiss the FAC for lack of personal jurisdiction and failure to state a claim on August 11, 2021.  Doc. 6.  That same day, formerly named defendants Gunawardhana and Fletcher—along with Ridge Hill and Ataraxia—filed a separate motion to dismiss for invalid service of process and failure to state a claim.  Doc 82.  Lastly, on November 10, 2021, Gross filed a motion to dismiss for failure to state a claim.  Doc. 107.

On March 1, 2022, the Court, ruling on these motions, dismissed Petrichor Malaysia, Petrichor UK, Nateshan, Vaidyanathan, Gunawardhana, and Fletcher (the "March 2022 Order").  Doc. 131 at 30.  The Court also dismissed the fraud claim against Ridge Hill.  *Id.*  20–22.  Moreover, and of particular relevance here, the Court dismissed all of the claims against Ataraxia, finding that Remcoda failed to sufficiently plead that Ataraxia acted as an alter ego of Ridge Hill.  *Id.* at 17–20, 29.  Accordingly, the court found that only two defendants remained: Ridge Hill and Gross.  *Id.* at 30.

On March 10, 2022, Remcoda submitted a letter, seeking reconsideration of Ataraxia's dismissal, or, in the alternative, clarification that Ataraxia's dismissal was without prejudice.

13

Doc. 132.  Ataraxia responded to the letter on March 18, 2022. Doc. 136.  On March 24, the

Court, having considered both of the parties' arguments, confirmed that the March 2022 Order

dismissed Ataraxia *without* prejudice.  Doc. 137.  The Court therefore granted Remcoda leave to

file another amended complaint.  *Id.*  Accordingly, Remcoda filed the SAC on April 25, 2022,

which names Ridge Hill, Ataraxia, and Gross as the only defendants, and which, in particular,

makes further allegations regarding the involvement of Ataraxia in the glove transaction.

Specifically, the SAC alleges that Gross, Gunawardhana, and Fletcher routinely referred to

"Ridge Hill/Ataraxia" as a singular unit, belonging to a "family" of companies, ¶¶ 23, 29; that

Gunawardhana and Fletcher referred to Ridge Hill/Ataraxia as their employer, ¶23; that

Ridge/Hill Ataraxia had a relationship with Vina Capital, a local joint venture partner that would

ensure a timely delivery of the gloves, *id.*;  and that Gross advised Remcoda that *Ataraxia* would

handle fulfilling the purchase order, ¶ 30.

The SAC brings five claims in total:  two claims against Gross, (1) fraudulent inducement

and (2) aiding and abetting fraud, and three claims against Ridge Hill and Ataraxia, (3) breach of

contract, (4) money had and received, and (5) unjust enrichment.  Remcoda claims that it has

been damaged in a total amount no less than $3,756,914 as a result of defendants' conduct.  ¶ 76.

Ataraxia Capital Partners moved to dismiss the SAC on June 30, 2022 for failure to state

a claim.  Doc. 153.  That same day, Russell Gross filed a separate motion to dismiss the SAC for

lack of subject matter jurisdiction and for failure to state a claim.  Doc. 155.

## II.     Standard

### a.  Rule 12(b)(1):  Lack of Subject Matter Jurisdiction

Federal Rule of Civil Procedure 12(b)(1) requires that an action be dismissed for lack of

subject matter jurisdiction when the district court lacks the statutory or constitutional power to

adjudicate the case.  Fed. R. Civ. P. 12(b)(1).  The party asserting subject matter jurisdiction carries the burden of establishing, by a preponderance of the evidence, that jurisdiction exists. *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)).  "On a Rule 12(b)(1) motion challenging the district court's subject matter jurisdiction, the court may resolve the disputed jurisdictional fact issues by referring to evidence outside of the pleadings . . . ."  *Zappia Middle East Constr. Co. Ltd. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000).  When evaluating a motion to dismiss for lack of subject matter jurisdiction, the court accepts all material factual allegations in the complaint as true but does not draw inferences from the complaint favorable to the plaintiff. *J.S. ex rel. N.S. v. Attica Cent. Sch.*, 386 F.3d 107, 110 (2d Cir. 2004) (citing *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998)).

### b.  Rule 12(b)(6):  Failure to State a Claim

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556.  The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 557).  However, this "flexible 'plausibility standard'" is not a heightened pleading standard, *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 n.3 (2d Cir. 2007) (citation omitted), and "a complaint . . . does not need detailed factual allegations" to survive a motion to dismiss, *Twombly*, 550 U.S. at 555.

The question on a motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Justice v. Nath*, 893 F. Supp.2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)). "[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits" or "weigh[ing] the evidence that might be offered to support it." *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (internal citations and quotation marks omitted). Accordingly, when ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014). "For purposes of this rule, the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (internal quotation marks omitted).

## III. Discussion

### a. Gross' Rule 12(b)(1) Motion to Dismiss for Lack of Subject Matter Jurisdiction

The Court's jurisdiction over this case is premised on diversity. "It is well settled that diversity jurisdiction does not exist where plaintiff is a citizen of a state of which any defendant is also a citizen." *Ravic, Inc. v. Cinram, Inc.*, 907 F. Supp. 102, 103 (S.D.N.Y. 1995). A limited liability company like Remcoda is a citizen of the state of its members. *Carter v. HealthPort Techs, LLC*, 822 F.3d 47, 60 (2d Cir. 2016). A court must evaluate the "challenges to subject-matter jurisdiction premised upon diversity of citizenship against the state of facts that existed at the time of filing[.]" *Grupo Dataflux v. Atlas Global Group, L.P.*, 541 U.S. 567, 570–71 (2004)

(marks and citation omitted).  Additionally, when, as here, a party alleges that there has been a change of domicile, the "party alleging [such] change . . . has the burden of proving [it] by clear and convincing evidence."  *Palazzo ex rel. Delmage v. Corio*, 232 F.3d 38, 42 (S.D.N.Y. 2000) (quoting *Katz v. Goodyear Tire & Rubber Co.,* 737 F.2d 238, 243–44 (2d Cir. 1984) (marks omitted)).  "To effect a change of domicile, two things are indispensable:  First, residence in a new domicile; and second, the intention to remain there."  *Palazzo*, 232 F.3d at 42.

Here, Gross asserts that when Remcoda brought this action on February 3, 2021, Garson, its sole member, was a citizen of New York—not Florida—and that the Court therefore does not have jurisdiction over this case, since Gross is also a citizen of New York.  In particular, Gross argues that Remcoda should be required to stand by its March 1, 2021 representation to the *SR3D* court regarding Garson's citizenship.  *See* Doc. 156-2.  For the reasons set forth below, the Court disagrees.

On January 27, 2021—when Garson and his wife, while living in Florida, were discussing the possibility of living in Florida permanently, Garson Decl. ¶¶ 10–11—Remcoda commenced the *SR3D* Action, claiming that Garson was domiciled in New York.  Five days later, on February 1, 2021, Garson claims to have become a Florida resident because he and his wife were living in Florida and decided to reside in Florida permanently.  *Id.* ¶ 11.  Two days after that, on February 3, 2021, Remcoda filed the instant action also on the basis of diversity jurisdiction, naming Gross—a New York resident—as a defendant.

On March 1, 2021, counsel for Remcoda in the *SR3D* Action advised Judge Schofield that the court held diversity jurisdiction over the case because "Garson is a resident and citizen of New York" and the defendant "is a Florida corporation."  *See* Doc. 156-2.  In the instant action, however, Remcoda claims that Garson has continuously been a citizen of Florida ever since

February 1, 2021, one month before it represented to the *SR3D* court that Garson was a New York citizen.  According to Gross, these representations cannot be squared:  Garson could not have been a citizen of New York on March 1, 2021 if he, as Remcoda now represents, permanently lived in Florida from February 1, 2021 through the present.

In response, Remcoda argues that "the entire point of the letter to Judge Schofield was to confirm subject matter jurisdiction existed in that action," and that the letter intended to represent where Garson was domiciled at the time the action was filed.  Doc. 165 at 18.  Deciding diversity turns on the "the state of facts that existed at the time of filing[.]"  *Grupo Dataflux*, 541 U.S. at 570–71.  Thus, informing Judge Schofield where Garson was domiciled on March 1, 2021 would not have addressed her question:  where Garson was domiciled at the time of filing, on January 27, 2021.  The Court therefore hesitates to treat as deliberate counsel's use of the present tense in referring to Garson's place of residence, since his citizenship on March 1, 2021 had no bearing on whether the court had jurisdiction.[17]

Moreover, the allegedly inconsistent representation made in the March 1, 2021 letter does not unilaterally resolve the question of where Garson was domiciled on February 1, 2021 for purposes of deciding if the Court has jurisdiction over the instant action.  In arguing that the Court should hold Remcoda to its prior statement to the *SR3D* court, Gross relies heavily upon *Ibrani v. Mabetex Project Engineering*, No. C–00–0107 (CRB), 2002 WL 1226848, at *3 (N.D. Cal. May 31, 2002).  *See* Doc. 166 at 6– 8.  There, a California federal court deemed a plaintiff "judicially estopped from . . . tak[ing] a position directly contrary to [] prior assertions [made in a separate proceeding] . . . for the purposes of creating diversity jurisdiction."  *Ibrani*, 2002 WL

---

[17] In fact, Remcoda could have represented to Judge Schofield that Garson was a citizen of New York on January 27, 2021 and a citizen of *Florida* on March 1, 2021—the same state where SR3D resided—and diversity would not have been destroyed as a result, as the operative question was Garson's place of domicile on January 27, 2021.

1226848, at *3 (marks and citations omitted).  Courts in this Circuit, however, have not given

prior inconsistent statements in separate proceedings preclusive effect when it comes to

determining jurisdiction.  Indeed, the Second Circuit in *Wight v. BankAmerica Corp.* cautioned

courts to take "special care. . . in considering whether judicial estoppel should . . . apply to

matters affecting federal subject matter jurisdiction," noting further that "[s]pecial care in this

area makes eminently good sense[, as i]t is axiomatic that a lack of subject matter jurisdiction

may be raised at any time[,] even by a party who originally asserted jurisdiction."  219 F.3d 79,

90 (2d Cir. 2000) ("The bottom line is that . . .  courts have an *independent* obligation to ensure

that federal jurisdiction is not extended beyond its proper limits.") (emphasis added) (internal

marks and citations omitted); *see also Techno-TM, LLC v. Fireaway, Inc.*, 928 F. Supp. 2d 694,

698 (S.D.N.Y. 2013) (explaining that while prior inconsistent statements may "help [courts to]

determine" a party's true place of residence, they cannot "conclusively establish or defeat subject

matter jurisdiction").  The March 1, 2021 letter is therefore not dispositive.  Rather, it is one

factor that the Court considers as part of its independent analysis to determine whether

jurisdiction is appropriate.  *See Wight* 219 F.3d at 90.  Additionally, the Court, as noted,

considers the letter in the context of its purpose, *i.e.*, to respond to Judge Schofield's request to

understand where Garson was domiciled on January 27, 2021.

Beyond the March 1, 2021 letter, however, Gross asserts that certain facts suggest that

Garson was still a citizen of New York as of February 3, 2021, namely that:  Garson was still

registered to vote in New York, Garson Decl. ¶ 21; he and his wife had New York driver's

licenses and a New York-registered vehicle, *id.* ¶ 14; and he did not use a Florida-based financial

institution, *id.* ¶ 13.  Gross further notes that Garson did not purchase Florida property until

December 2021—11 months after allegedly deciding to settle there permanently, *id.* ¶¶ 16–17—

and that he has still not disclosed whether he continued to maintain his New York apartment at any point after January 31, 2021.

In in response, Remcoda sets forth a variety of arguments.  First, with respect to Garson's voter status, Remcoda highlights that he is an "inactive voter" in New York.  *Id.* ¶ 21.  Second, Garson explains in his declaration that he has delayed registering his vehicles Florida because the Florida Department of Vehicles has offered "limited in-office services" as a result of the COVID-19 pandemic; moreover, Garson has faced little urgency to secure a new license because his is not scheduled to expire until 2027.  Garson Decl. ¶ 10; *see also Apace Communs. Ltd. v. Burke*, No. 07 Civ. 6151L (DGL), 2009 WL 1748711, at *5 (W.D.N.Y. June 19, 2009) (noting that the "[defendant's] continued possession of a New York State driver's license is likewise insignificant . . . [as t]here is no requirement that a person surrender his New York driver's license upon moving out of the state.").  Third, while Remcoda does not deny that Garson did not use a Florida-based financial institution, Garson asserts that he had no need to.  Garson Decl. ¶ 10.  During the relevant period, Garson had only one bank account with Citibank.  *Id.*  And because Citibank had a national presence and Garson conducted "virtually all of [his] transactions online," he chose not to move his assets to a Florida bank.  *Id.*; *see also Apace Communs. Ltd.*, 2009 WL 1748711, at *5 (Defendant's "decision to maintain his New York-based bank account also means little. . . .  In this era of internet banking, the physical location of one's bank is of less significance than it once was, since many transactions can be performed using a computer from anywhere in the world").  Lastly, Remcoda asserts that Garson and his wife did not purchase a Florida property until December 2021 because they needed time to evaluate the home sale market—which was allegedly experiencing a housing boom amid the COVID-19 pandemic—and to find a permanent house to suit their needs.  Garson Decl. ¶ 15.

Separately, Remcoda argues that additional facts prove that Garson intended to permanently reside in Florida as of February 1, 2021.  First, since departing New York in October 2020, Garson has not rented or owned a residence anywhere other than Florida, except for a short-term summer vacation rental.  *Id.* ¶ 7.  Since that time, Garson also has seen only Florida-based physicians and has spent more than 80% of his time in Florida, leaving the state only to travel for business or for vacation.  *Id.* ¶¶ 7, 18.  Also since October 2020, Garson has worked from his home in Florida and not from New York.  He therefore did not pay New York state taxes for 2021 and does not anticipate paying New York state taxes for 2022 or any year thereafter.  *Id.* ¶ 8.  Garson's request for an extension to file his federal taxes similarly reflects a Florida address.  *Id.*  Shortly after relocating to Florida, Garson and his wife also joined a tennis club and have maintained no ties to New York organizations.  *Id.* ¶¶ 9, 19–20.  Of particular importance, the bank statements from the joint Citibank account of Garson and his wife reflect their New York address in the January 2021 statement but their *Florida* address in the February 2021 statement.  *See* Doc. 165-2.  Additionally, Garson and his wife, to date, continue to reside in Florida in a permanent home that they purchased in December 2021.  Garson Decl. ¶ 17; *see also* Docs. 165-5; Doc. 156-14.  Lastly, Garson's sworn declaration itself is entitled to some weight in determining whether he is a citizen of Florida.  *See Rapp v. Flower*, No. 20 Civ. 9586 (LAK), 2022 WL 2037682, at *3 (S.D.N.Y. June 6, 2022) (noting that a "general rule in the Second Circuit has been that a sworn statement regarding citizenship is, by itself, a strong factor in favor of a similar judicial finding") (marks and citations omitted).

Taking into account all of the foregoing, the Court concludes that Remcoda has made the requisite evidentiary showing to establish that Garson was a citizen of Florida on February 3,

2021.  Accordingly, the Court has jurisdiction over this case, and Gross' Rule 12(b)(1) motion is denied.

### b.  Gross' Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim of Fraudulent Inducement

Gross separately argues that the SAC fails to sufficiently state a claim against him for fraudulent inducement.  For the reasons set forth below, the Court disagrees.

To state a claim for fraudulent inducement under New York law, a claimant must allege that "(1) defendant made a representation as to a material fact; (2) such representation was false; (3) defendant intended to deceive plaintiff; (4) plaintiff believed and justifiably relied upon the statement and was induced by it to engage in a certain course of conduct; and (5) as a result of such reliance plaintiff sustained pecuniary loss."  *Stephenson v. PricewaterhouseCoopers, LLP*, 482 F. App'x 618, 622 (2d Cir. 2012), *as amended* (June 13, 2012) (summary order) (marks and citation); *Amida Capital Mgmt. II, LLC v. Cerberus Capital Mgmt., L.P.*, 669 F. Supp. 2d 430, 444 (S.D.N.Y. 2009) (stating that the fraudulent inducement elements are similar to common law fraud elements).  In addition, "the [c]omplaint must . . . state with particularity the circumstances of the fraud under Rule 9(b) and contain sufficient facts, accepted as true, to state claims for relief for common-law fraud that are facially plausible under Rule 8(a)(2)."  *Woori Bank v. RBS Sec., Inc.*, 910 F. Supp. 2d 697, 700–01 (S.D.N.Y. 2012); *see also* Fed. R. Civ. P. 9(b) ("In alleging fraud . . ., a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.").

In the March 2022 Order, the Court denied Gross' motion to dismiss the FAC's claims of fraudulent inducement for the following reasons.[18]  Doc. 131.  First, the Court held that neither the Procurement Agreement nor the Purchase Agreement prevent Gross from being held liable. With respect to the Procurement Agreement, the Court noted that "even if [the agreement] definitively stated that Gross was no more than a passive agent [between Remcoda and Ridge Hill], it would still be possible that Gross engaged in a fraudulent scheme with Ridge Hill *outside* the bounds of the [the agreement]." Doc. 131 at 24 (emphasis added).  Thus, the Procurement Agreement, no matter its terms, cannot shield Gross from liability.  *Id.*  Relatedly, the Court also found that even though Gross was not party to the Purchase Agreement, he still could have acted as an agent of Ridge Hill in furtherance of fraud.  *See* Doc. 131 at 25. Specifically, the Court regarded certain allegations in the FAC sufficient to sustain the claim that Gross acted on behalf of Ridge Hill.  Doc. 131 at 25–26 (highlighting that the FAC pleaded that Gross twice represented that Ridge Hill could immediately provide gloves and that Gross was working with the other defendants from the start to defraud Remcoda) (citing Doc. 56 ¶¶ 23, 29, 71).[19]

Next, the Court held that the FAC sufficiently alleged that Gross knew that his alleged statements were false.  According to the Court, the fee that Gross stood to earn if the deal was consummated adequately established a motive and opportunity to defraud, such that gives rise to

---

[18] As discussed in further detail herein, in the March 2022 Order, the Court also denied Gross' the motion to dismiss the claim of aiding and abetting fraud.  Doc 131 at 28 ("The same allegations supporting the fraudulent inducement claim support the aiding and abetting fraud claim. . . .  As the Court has concluded that the fraudulent inducement claim satisfies Rule 9(b), the Court concludes the same for the aiding and abetting claim.").

[19] The SAC makes these same allegations.  *See* ¶ 22 ("Gross advised [Remcoda] that Gunawardhana and Fletcher were agents of Ridge Hill, one of Gross's purported 'proprietary manufacturing and supply relationships' that would be able to immediately provide [Remcoda] with nitrile examination gloves."); ¶ 28 ("Gross confirmed that Ridge Hill could immediately provide black nitrile food-grade gloves."); ¶ 75 ("Gross . . . was working with [d]efendants from the start when he introduced [Remcoda] to Ridge hill as part of [d]efendants' scheme.").

an inference of fraudulent intent when considered alongside the FAC's other allegations. *See* Doc. 131 at 27 (citing *Minnie Rose LLC v. Yu*, 169 F. Supp. 3d 504, 518 ) (S.D.N.Y. 2016) (finding that the plaintiff's ability to enrich itself through the alleged fraud constituted concrete and personal benefit from which scienter could be inferred)); *see also* Doc 131 at 26 (noting that the FAC pleaded that Gross wanted the 5% fee for himself and never intended to provide Remcoda the gloves) (citing Doc. 56 ¶ 37).[20]

As part of its analysis, the Court also considered the following allegations in the FAC: that (1) Gross told Remcoda that he was working with Gunawardhana, Fletcher, and others to work out financing and payment, Doc 56 ¶¶ 29, 32; (2) Gross "urged [Remcoda] to move forward with the transaction with Ridge Hill," *id.* ¶ 32; (3) Gross knew it made false representations to Remcoda, *id.* ¶ 36; (4) Remcoda relied on Gross' false representations in deciding to enter into the agreement with Ridge Hill, ultimately leading to financial loss, *id.* ¶¶ 39, 72.[21]

As shown, the SAC contains *same* allegations as those made in the FAC that the Court relied upon in denying Gross' prior motion to dismiss. The only relevant changes in the

---

[20] Like the FAC, the SAC also alleges that Gross intended to receive the 5% fee without ever providing Remcoda the gloves. *See* ¶ 41 ("Defendants, at all times, intended to enrich themselves at [Remcoda's] expense by retaining [Remcoda's] deposit, with Gross receiving his 5% fee from [defendants], without ever providing the product to [Remcoda].").

[21] The SAC makes each of these allegations. *See* ¶ 28 ("Gross represented to [Remcoda] that he was working with Gunawardhana and Fletcher, as agents of 'Ridge Hill/Ataraxia,' to determine specifics for financing an payment of the transaction."); ¶ 35 ("Gross represented to [Remcoda] that he . . . was presently working to obtain financing for future transactions"); *Id.* ("[Gross] urged [Remcoda] to move forward with the transaction with Ridge Hill on a 50% up-front deposit basis[.]"); ¶ 40 (The representations of Gunawardhana and Fletcher regarding the availability of the nitrile gloves "were false[,] and Gross . . . knew that they were false."); ¶ 43 ("In further reliance on Gross, Gunawardhana, and Fletcher's false statements, and the support shown by Ataraxia through Sri and Sebastian, on July 16, 2020, [Remcoda] entered into [the Purchase Agreement.]"); ¶ 76 ("As a result of [d]efendants' fraudulent scheme, . . . [Remcoda] was unable to meet its commitments to provide nitrile gloves to its customers and lost profits in the amount of at least $676,040.  Moreover, [Remcoda] has been unable to repay its lender for the financing in connection with the [Purchase] Agreement and [Remcoda] has been forced to pay in excess of $650,000 in interest[.]").

pleadings concerning Gross are that:  (1) in a telephone call with Remcoda, Gross passed along information provided to him in the June 30 Email from Gunawardhana about the Ridge Hill/Ataraxia/Vogue Tex "family" and the ability of Sri and Sebastian to oversee the supply chain, *see* Doc. 156-29, ¶¶ 29–30; (2) during that phone call, Gross separately advised Remcoda that Ridge Hill//Ataraxia would be open to pre-funding proposals for large PPE orders and that it was not a "'fly by night' operation"—information *not* contained in the June 30 Email, *compare* Doc. 156-29 *with* ¶ 30.

 The Court understands Gross to make five arguments in support of his motion, each of which is unavailing, for the following reasons.

### i.   The Procurement Agreement

First, Gross raises an argument identical to one that the Court rejected in the March 2022 Order:  that because the Procurement Agreement limited his role to acting as a broker, he cannot be held liable.  *See* Doc. 163 at 13–14.  Again, the Court holds that "[t]he terms of the [P]rocurement [A]greement, which speak to Gross' role as a procurement agent introducing Remcoda to Ridge Hill, *do not and cannot* fully address the scope of Gross' alleged relationship with Ridge Hill."  Doc. 131 at 24 (emphasis added).

Relatedly, Gross emphasizes that although *he* signed the Procurement Agreement, it provided that *Unicorn*—the company where he is a partner—would receive a 5% fee, and only if a transaction was *consummated*.  *See* Doc. 156-15.  According to Gross, this provision "eliminates any inference that [he] had motive to [induce] Remcoda [into] pay[ing] money to Ridge Hill for PPE that it would never receive."  *See* Doc. 163 at 14, 24 (citing Black's Law Dictionary (11th ed. 2019) (defining a "consummated" transaction as one that has been "br[ought] to completion")).  Absent a completion of the transaction, Gross asserts that he would

not have had any reason to believe that he would receive the 5% fee; and that *Unicorn* stood to earn the 5% fee further precludes a finding that he had any motive to defraud.  *See* Doc. 163 at 23–25.  Again, the Court declines to find that any one provision of the Procurement Agreement immunizes Gross from fraud liability, particularly in light of the specific allegations regarding his involvement with the deal.  Doc. 131 at 24 ("[I]t would still be possible that Gross engaged in a fraudulent scheme with Ridge Hill *outside* the bounds of the [the agreement].").

### ii.  Reliance

Second, Gross asserts that Remcoda relied on its own due diligence in deciding to proceed with the transaction after he introduced it to Ridge Hill.  *Id.* at 14.  Specifically, Gross contends that communications between the parties demonstrate that Remcoda repeatedly communicated with Ridge Hill about its ability to supply the gloves.  *See id.* at 14–15 (citing Doc. 156-19 at 2 (a June 9, 2020 email from Gunawardhana to Remcoda, describing Ridge Hill's relationship with Vina Capital—"one of the largest and most prominent companies and asset managers in Vietnam"—in order to provide "reassurance that [Ridge Hill would] be able to deliver as per schedule."); Doc. 156-23 (Gunawardhana assuring Remcoda that "all [was] okwith stock).  Over the course of the dealings, Gross contends that Ridge Hill sent Remcoda "dozens of detailed messages touting its ability to procure PPE."  Doc. 163 at 15.  Gross also notes that the SAC alleges that Remcoda performed its own research by reviewing Ataraxia's website.  *Id.* at 17 n. 4 (citing ¶ 30).

That Ridge Hill advised Remcoda of its capacity to fulfill the purchase order does not alter the fact that the SAC, like the FAC, alleges that Gross *also* communicated with Remcoda about the availability of the gloves in an effort to drive the deal forward.  *See, e.g.*, ¶¶ 22, 28; *see also* ¶ 30 (stating that Gross vouched for Ridge Hill/Ataraxia as an established supplier).  Indeed,

26

the SAC, like the FAC, expressly alleges that that Remcoda relied upon the false representations

of Gunawardhana, Fletcher, *and* Gross.  ¶ 43.  The communications now cited by Gross do not

require the Court to deviate from its prior holding.  Neither does the fact that Remcoda visited

Ataraxia's website.  It remains that Remcoda has adequately alleged that Gross made

misrepresentations on which it relied.

> ### iii.  Inference of Actual Knowledge

Third, Gross asserts that documents obtained during discovery reveal that his alleged

misrepresentations "amount to nothing more than information that he received from Ridge Hill

and then promptly passed on to Remcoda."  Doc. 163 at 23.  According to Gross, he played a

minimal role in the transaction, limited to introducing Remcoda to Ridge Hill and relaying

information between the two.  *Id.* at 22.  Gross therefore argues that it cannot be inferred that he

actually knew of a fraudulent scheme.  *Id*.  In support of this argument, Gross points to a variety

of documents that purportedly show his limited involvement in the dealings, including, for

example, a June 9, 2020 email from Gross to a Gunawardhana, in which Gross promised to

"connect everyone over email and [W]hats[A]pp."  Doc. 156-24; *see also* Doc. 156-26 (June 9,

2020 email exchange initiated by Gross, copying Remcoda and Ridge Hill); Doc. 156-25 (June

9, 2020 WhatsApp message thread initiated by Gross, including Remcoda and Ridge Hill).

Additionally, Gross argues that the June 30 Email "confirms that [he] obtained the referenced

information [regarding the Ridge Hill/Ataraxia/Vogue Tex "family" company] directly from

Ridge Hill and then conveyed it to Remcoda."  Doc. 163 at 22–23.

The Court finds this argument unavailing.  In the 2022 Order, the Court deemed the

FAC's specific allegations regarding Gross' misrepresentations—which are unchanged in the

SAC—along with the 5% compensation Gross stood to receive, sufficient to substantiate an

inference of actual knowledge.  Doc. 131 at 27 ("Taken together, Remcoda's specific allegations regarding Gross's representations, its allegations that Gross was an agent of Ridge Hill engaged in a common fraudulent scheme, and its allegations regarding the personal and concrete benefit Gross would receive in the form of a 5% fee are sufficient to satisfy Rule 9(b) and the elements of a fraudulent inducement claim at the motion to dismiss stage.").  Even if Gross at times acted merely as a broker, the SAC pleads that at other times, he worked actively to drive the deal forward.  *See, e.g.*, ¶ 35 (stating that on July 14, 2020, Gross urged Remcoda to move forward with the deal in light of its time constraints).  Furthermore, the June 30 Email does not contradict this conclusion.  The SAC pleads that *in addition* to relaying the information contained in the June 30 Email about the Ridge Hill/Ataraxia/Vogue Tex "family," Gross advised that Ridge Hill/Ataraxia would consider pre-funding proposals for large PPE orders and assuring that Ridge Hill/Ataraxia was not a "fly-by-night" company.  These additional details are *not* contained in the June 30 Email, and Gross therefore did not simply parrot them from Ridge Hill to Remcoda. ¶ 30; Doc. 156-29.[22]  Moreover, the June 30 Email does not conclusively demonstrate that Gross learned the information that he provided to Remcoda from that email or that he did not know that this information was false.

### iv.  The Economic Loss Doctrine

Fourth, Gross argues that the economic loss doctrine bars Remocoda's fraudulent inducement claim.  "Under New York law, a tort action for economic loss will not lie where the parties' relationship is governed by an express contract."  *Ambac Assurance Corp. v. U.S. Bank Nat'l Ass'n*, 328 F. Supp. 3d 141, 157-58 (S.D.N.Y. 2018) (quoting *Commerzbank AG v. U.S.*

---

[22] The only reference to "funding" in the June 30 Email is a general statement that "Sri . . . and Sebastian . . . [t]ogether . . . manage the supply chain and offer customers contract, legal funding and financial support."  Doc. 156.  The June 30 Email does not reflect Ridge Hill/Ataraxia's openness to pre-funding large PPE purchase orders and does not once mention Remcoda.  *Id.*

*Bank Nat'l Ass'n*, 277 F. Supp. 3d 483, 496 (S.D.N.Y. 2017).  Accordingly, "if the damages

suffered are of the type remediable in contract, a plaintiff may not recover in tort." *Manhattan*

*Motorcars, Inc. v. Automobili Lamborghini, S.p.A.*, 244 F.R.D. 204, 220 (S.D.N.Y. 2007).

  However, "[m]ost district courts applying New York law . . . 'have declined to apply the

economic loss rule to intentional torts,' such as fraud, 'citing the absence of any New York

authority to the contrary' and noting 'that New York courts have long routinely permitted fraud

claims for pure economic loss to proceed.'"[23]  *Chung v. Igloo Products Corp.*, No. 20 Civ. 4926

(MKB), 2022 WL 2657350, at *14 n. 9 (E.D.N.Y. July 8, 2022) (ultimately declining to apply

the economic loss rule to a fraud claim) (quoting *In re General Motors LLC Ignition Switch*

*Litig.*, 257 F. Supp. 3d 372, 432 (S.D.N.Y. 2017) (marks and citations omitted)); *see also*

*Sussman Sales Co. v. VWR Int'l, LLC*, No. 20 Civ 2869, 2021 WL 1165077, at *11 n.16

(S.D.N.Y. Mar. 26, 2021) ("[A] number of courts in this District have determined that New

York's economic loss doctrine does not apply to intentional torts such as fraud, and have

refrained from dismissing fraud claims on this basis.") (citations omitted).

  The court in *General Motors*, for example, declined to apply the economic loss doctrine

to a fraudulent inducement claim, explaining that the minority of courts that *have* applied the

economic loss rule to intentional  torts have "relied solely on [*Orlando  v. Novurania of America,*

*Inc.*, 162 F. Supp. 2d 220, 226 n. 2 (S.D.N.Y. 2001)] which, in turn, cited no authority for its

conclusion, leading [other courts] to find it unpersuasive."  257 F. Supp. 3d at 432.  Since

*General Motors*, the majority of courts have come out similarly.  *See Federal Deposit Insurance*

---

[23] *See, e.g.*, *First Bank of Americas v. Motor Car Funding, Inc.*, 257 A.D.2d 287, 690 N.Y.S.2d 17, 21–22
(1999) (allowing fraud claims to advance, despite alleging only economic damages); *Stevenson Equipment, Inc. v.
Chemig Construction Corp.*, 170 A.D.2d 769, 565 N.Y.S.2d 318, 319–20 (1991) (upholding a jury verdict awarding
the plaintiff economic recovery based on a claim of fraudulent concealment); *Deerfield Comm. Corp. v.
Chesebrough–Ponds, Inc.*, 68 N.Y.2d 954, 510 N.Y.S.2d 88, 502 N.E.2d 1003, 1004 (1986) (affirming a lower
court's denial of a motion to dismiss the plaintiff's fraudulent concealment counterclaim where another counterclaim
sounded in contract and the only alleged damages were purely economic).

*Corp. for First NBC Bank v. Murex LLC*, No. 16 Civ. 7709 (PAE), 2018 WL 2694431, at *8

(S.D.N.Y. June 5, 2018) ("Upon a fresh review of the case law and the absence of any contrary

authority from the New York state courts, [the court's view] is that New York's economic loss

doctrine does not clearly bar intentional fraud claims.  Accordingly, the Court will not dismiss

the SAC's intentional fraud claim on that basis.") (marks and citations omitted); *see also Cargo*

*Logistics International, LLC v. Overseas Moving Specialists Inc.*, 557 F. Supp. 3d 381, 397 n. 12

(E.D.N.Y. 2021) (declining to apply the economic loss rule to a fraud claim); *Nuwer v. FCA US*

*LLC*, 552 F. Supp. 3d 1344, 1360 (S.D. Fla. 2021) (same, applying New York law); *In re*

*Chevrolet Bolt EV Battery Litigation*, No. 20 Civ. 13256 (TGB) (CI), 2022 WL 4686974, at *25

(Sept. 30, 2020 E.D. Mich.) (same).

        In light of the foregoing recent authority, the Court declines to follow the cases cited by

Gross in which courts have applied the economic loss doctrine to dismiss an intentional tort

action.  *See, e.g.*, *Basso v. New York University*, No. 16 Civ. 7295 (VM), 2020 WL 7027589, at

*12 (S.D.N.Y. Nov. 30, 2020); *251 West 30th Owner LLC v. Justin Tower, LLC*, No.

652192/2017, 2018 WL 5448618, at *5–7 (N.Y. Sup. Oct. 29, 2018).  Additionally, the Court

notes that each of these cases involved claims concerning duties arising from a contractual

relationship between the parties.  *See, e.g., Basso*, 2020 WL 7027589, at *12 (noting that "the

actionable language [p]laintiffs allege is part of the contractual relationship between the parties,"

and, moreover, that plaintiffs' complaint failed to "distinguish between representations as the

basis for [their] . . . fraud claims on the one hand and the breach of contract claim on the other").

Here, Gross was not party to the Purchase Agreement.  While courts *have* applied the economic

loss doctrine to bar tort claims against a defendant, even in the absence of a contractual remedy

against that defendant, *see, e.g., In re MF Global Holdings LTD. Inv. Litigation*, 998 F. Supp. 2d

157, 184–86 (S.D.N.Y. 2014), Gross fails to identify any such case in which a court did so to

dismiss an *intentional* tort, like fraud

Furthermore, the Court finds unavailing Gross' argument that the fraudulent inducement

claim should be dismissed because Remcoda has not alleged that Gross owed it a duty separate

from the contractual duties imposed on Ridge Hill/Ataraxia through the Purchase Agreement.

*Weisblum v. Prophase Labs, Inc.*, 88 F. Supp. 3d 283, 297–98 (S.D.N.Y. 2015).  To support a

claim of fraudulent inducement, a plaintiff may "demonstrate a fraudulent misrepresentation

collateral or extraneous to the contract."  *Bridgestone/Firestone, Inc. v. Recovery Credit

Servs.,* 98 F.3d 13, 20 (2d Cir. 1996).  Further, "it is well established that a misrepresentation of

present fact which is the inducement for a contract . . . can support a separate fraud claim."  *EED

Holdings v. Palmer Johnson Acquisition Corp,* 387 F. Supp. 2d, 279 (S.D.N.Y. 2004).  In this

case, Remcoda alleges that Gross made misrepresentations about Ridge Hill/Ataraxia and that

those misrepresentations induced Remcoda to enter into the Purchase Agreement.  "Those

allegations suffice for now."  *Weisblum*, 88 F. Supp. 3d at 297–98 (declining to apply the

economic loss rule to fraud claims).  For these reasons, the Court declines to apply the economic

loss doctrine to bar Remcoda's fraudulent inducement claim against Gross.

                    *v.  Duplicative Claims*

Lastly, Gross argues that Remcoda's fraudulent inducement claim is duplicative of its

claim for breach of contract against Ridge Hill and Ataraxia.

When "a claim to recover damages for fraud is premised upon an alleged breach of

contractual duties and the supporting allegations do not concern representations which are

collateral or extraneous to the terms of the parties' agreement, a cause of action sounding in

fraud does not lie."  *McKernin v. Fanny Farmer Candy Shops, Inc.*, 574 N.Y.S. 2d 58 (2d Dep't

1991). "But that principle only applies to certain parties: '*a fraud claim may be dismissed as duplicative only as against a defendant against whom the related contract claim is viable*;' it does not bar claims against a person 'who was not a party to [the relevant] contract, and is being sued personally for his [allegedly] willful misrepresentations, not for breach of any contract.'" *Integrated Construction Enterprises, Inc. v. GN Erectors, Inc.*, No. 16 Civ. 5561 (PAE), 2020 WL 614991, at *5 (S.D.N.Y. Feb. 10, 2020) (emphasis added) (internal marks omitted) (quoting *Sun Prod. Corp. v. Bruch*, 507 F. App'x 46, 47–48 (2d Cir. 2013)); *see also In re Fyre Festival Litigation*, 399 F. Supp. 3d 203, 212 (S.D.N.Y. 2019) (holding on motion to dismiss that "[b]ecause neither [of the defendants] were party to the contract at issue, the fraud claims against them were not duplicative of the breach of contract claim.").

Gross asserts that because the fraudulent inducement claim seeks the identical damages as the breach of contract claims against Ridge Hill and Ataraxia, the fraud claim should be dismissed as duplicative. *See* Doc. 166 at 13–14; *compare* ¶ 84 (describing damages sought in connection with the fraudulent inducement claim) *with* ¶ 96 (describing damages sought in connection with the breach of contract claim) (both seeking damages no "less than $3,756,914, plus costs, interest, expenses and attorneys' fees in amounts to be determined at trial."). Remcoda argues however, that it seeks damages against Gross that are different from, and not available through, a breach of contract claim. For example, under New York Law, Remcoda's out-of-pocket losses, including financing payments, may be recovered through a fraud claim but not a breach of contract claim. *See, e.g.* ¶ 4 ("Plaintiff brings this action to recover its . . . out of pocket expenses resulting from defendants' fraud [and] breach of contract[.]").

In any event, the Second Circuit has made clear that a fraud claim is duplicative of a breach of contract claim *only if* it is brought against a defendant against whom the breach of

contract claim is also viable.  *See also Exchange Listing, LLC v. Inspira Technologies, Ltd.*, No. 22 Civ. 1889 (KPF), 2023 WL 2403223, at \*15 (S.D.N.Y. Mar. 8, 2023) ("[A] plaintiff may separately state a claim for fraud against a non-party to a contract that would otherwise be barred as duplicative of a breach of contract claim against a party to the contract."); *Congelados del Cibao v. 3 Kids Corporation*, No 19 Civ. 7596 (LJL), 2022 WL 1321397, at \*9 n.4 (finding that "[b]ecause the court had held that no viable breach of contract claim lies against [a certain defendant] . . . the fraud in the inducement claim asserted [against him] cannot be dismissed as duplicative"); *Apple* v. *Atl. Yards Dev. Co., LLC*, No. 11 Civ. 5550 (JG) (JMA), 2012 WL 2309028, at \*7 (E.D.N.Y. June 18, 2012) ("The rule that a plaintiff may not base a fraud claim on a breach of contract has no application to anyone who is not a party to the relevant contract.").

 Accordingly, the Court declines to dismiss the fraudulent inducement claim against Gross as duplicative of the breach of contract claim against Ridge Hill and Ataraxia.

### c. Gross' Rule 12(b)(6) Motion to Dismiss the Aiding and Abetting Fraud Claim

Gross also moves to dismiss the aiding and abetting fraud claim against him.  As noted in the March 2022 Order, the elements of a claim of fraudulent inducement are similar to the elements of a claim of aiding and abetting fraud.[24]  Gross does not set forth any additional arguments for why the aiding and abetting fraud claim should be dismissed distinct from those given with respect to the fraudulent inducement claim.  *See generally* Docs. 163; 166.

Currently, however, there are no remaining fraud claims against Ridge Hill or Ataraxia. The sole substantive fraud claim brought by Remcoda is the fraudulent inducement claim against

---

[24] "[T]o establish liability for aiding and abetting fraud under New York law, the plaintiffs must show (1) the existence of a fraud; (2) the defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission."  *Krys v. Pigott*, 749 F.3d 117, 127 (2d Cir. 2014) (marks and citations omitted).

Gross.  It is a general principal that one cannot aid and abet oneself in the commission of a tort.

*See Master-Halco, Inc. v. Scillia Dowling & Natarelli,* LLC, 739 F. Supp. 2d 109, 121 ("[I]t goes

without saying that individuals cannot aid and abet themselves.") (D. Conn. 2010); *see also*

*Lindsay v. Lockwood*, 625 Misc. 2d 228, 233 (N.Y. Sup. 1994) ("The archetypal aiding and

abetting defendant is one who encourages *another* to commit" a substantive tort.) (emphasis

added) (citations omitted); *McBride v. KPMG Intern.*, 24 N.Y.S. 3d 257, 260 (finding that

"without an underlying fraudulent inducement claim, [the adjoining] aid[ing] and abet[ing]

fraudulent inducement [claims] necessarily fail[.]"); *Kleinerman v. 245 East 87 Tenants Corp.*

9033 N.Y.S. 2d 356, 358 (N.Y. App. Div. 2010) (same).  Accordingly, the aiding and abetting

claim against Gross is dismissed.

### d.  Ataraxia's Rule 12(b)(6) Motion to Dismiss

Ataraxia argues that the Court should dismiss all of the claims against it because the SAC

fails to sufficiently allege that it is an alter ego of Ridge Hill.

"New York courts apply a presumption of separateness to corporations and are hesitant to

disregard the corporate form."  *Prescient Acquisition Grp., Inc. v. MJ Pub. Trust*, No. 05 Civ.

6298 (PKC), 2006 WL 2136293, at *4 (S.D.N.Y. July 3 1, 2006) (citing *DeJesus v. Sears,*

*Roebuck & Co.*, 87 F.3d 65, 70 (2d Cir. 1996)).  However, "New York law has long recognized

that it is possible for 'two corporations [to] have become so inextricably confused that it is

impossible or impracticable to identify the corporation that participated in the transaction

attacked."  *D. Klein & Sons, Inc. v. Good Decision, Inc.*, 147 Fed. Appx. 195, 196 (2d Cir. 2005)

(marks and citations omitted).  "A firm may be liable for the acts of a wrongdoer if the

wrongdoer is the other's alter ego."  *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 292

(S.D.N.Y. 2005).  That is to say, courts will disregard the corporate form "when the corporation

has been so dominated by an individual or another corporation[,] . . . and its separate identity so

disregarded, that it primarily transacted the dominator's business rather than its own[.]" *Wm.*

*Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 138 (2d Cir. 1991).

To prove that the corporate veil should be pierced, a plaintiff must show "(1) that the owner

exercised complete domination over the corporation with respect to the transaction at issue; and

(2) that such domination was used to commit a fraud or wrong that injured the party seeking to

pierce the veil." *Thrift Drug, Inc. v. Universal Prescription Adm'rs*, 131 F.3d 95, 97 (2d Cir.

1997) (quoting *Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997)).

"[C]onclusory allegations of an alter ego are insufficient to survive a motion to dismiss." *Kalin*

*v. Xanboo, Inc.*, 526 F. Supp. 2d 392, 403 (S.D.N.Y. 2007) (citations omitted).  However, "New

York courts have recognized that a veil-piercing theory often necessitates a fact laden inquiry

and thus is unsuited for resolution on a pre-answer, pre-discovery motion to dismiss." *City of*

*Almaty v. Ablyazov*, 278 F. Supp. 3d 776, 799 (S.D.N.Y. 2017) (marks and citations omitted).

  *i.   Complete Domination*

  With respect to the first prong of the analysis, there is no clear-cut test for determining

whether an entity has dominated another.  *See Variblend Dual Dispensing Systems LLC v.*

*Crystal International (Group) Inc.*, No. 18 Civ. 10758 (ER), 2019 WL 4805771, at *17

(S.D.N.Y. Sept. 30, 2019).  Courts, however, consider a variety of factors, including:

> (1) the absence of the formalities and paraphernalia that are part and parcel of the
> corporate existence, i.e., issuance of stock, election of directors, keeping of
> corporate records and the like, (2) inadequate capitalization, (3) whether funds are
> put in and taken out of the corporation for personal rather than corporate
> purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common
> office space, address and telephone numbers of corporate entities, (6) the amount
> of business discretion displayed by the allegedly dominated corporation, (7)
> whether the related corporations deal with the dominated corporation at arms
> length, (8) whether the corporations are treated as independent profit centers, (9)
> the payment or guarantee of debts of the dominated corporation by other

35

corporations in the group, and (10) whether the corporation in question had
property that was used by other of the corporations as if it were its own

*Passalacqua Builders*, 933 F.2d at 139.  "A complaint need not," however, "plead every single

factor that might play into an alter ego analysis; as long as there are some plausible allegations of

dominion and control, a plaintiff can survive a motion to dismiss."  *Sphere Digital, LLC v.*

*Armstrong*, 20 Civ. 4313 (CM), 2020 WL 6064153, at *6 (S.D.N.Y. Oct. 14, 2020).

Like in FAC, the SAC alleges that Ridge Hill and Ataraxia shared an office in Sri Lanka

(as demonstrated on the Ataraxia's website and in the Corporate Offer, ¶¶ 8, 94), that the entities

commingled funds, and that the companies shared overlapping employees, as evidence by

employees' use of Ataraxia email accounts to conduct business.  ¶ 8.  Although the Court

previously found that the FAC failed to adequately allege that Ataraxia dominated Ridge Hill,

*see* Doc. 131 at 19, the SAC provides additional details regarding Ataraxia's involvement with

Remcoda that further substantiate these allegations.

For example, the SAC alleges that Gross informed Remcoda that Ridge Hill/Ataraxia was

open to pre-funding PPE purchase orders, and that Fletcher advised Remcoda that he was

waiting for the Ridge Hill/Ataraxia personnel to respond to him before he could confirm whether

pre-financing the Remcoda order was possible.[25]  ¶¶ 30–31.  Additionally, the SAC alleges that

Gunawardhana and Fletcher referred to the entity for which they worked as Ridge Hill/Ataraxia

and that Gunawardhana represented to Remcoda that Ridge Hill/Ataraxia had direct access to

factories that could guarantee Remcoda a timely delivery of the gloves.  ¶ 23.  Furthermore, the

SAC alleges that Gross, passing along information provided to him by Gunawardhana, advised

Remcoda that "Ridge Hill was part of the Ataraxia family and that *Ataraxia*, through Sri and

---

[25] As discussed further herein, the Court disagrees with Ataraxia's contention that "the SAC fails to identify any
individuals who acted as agents of Ataraxia in communicating with Remcoda."  Doc. 168 at 5.

Sebastian [(who are alleged to have been partners in Ridge Hill Trading, Vogue Tex, and

Ataraxia, *see* ¶ 29)], would handle the fulfilment of [Remcoda's] purchase order[.]"  ¶¶ 29–30.

As further evidence of domination, the SAC suggests that there was a power imbalance between

Ridge Hill and Ataraxia.  *See* ¶ 30 (characterizing Ridge Hill as a "newly created entity,"

founded only in August 2019, compared to Ataraxia, which boasted a ten-year history, offices

around the world, 110 full-time employees, and institutional investors, including pension funds,

family offices, and state banks).

Each of these specific allegations—none of which appeared in the FAC, *see* Doc. 150-1

(a redline comparison of the FAC and the SAC)—make plausible the claim that Ataraxia

dominated Ridge Hill in its dealings with Remcoda.  *Sphere Digital*, 2020 WL 6064153, at *6.

Accordingly, the Court finds the first prong of alter ego analysis satisfied.

### ii.  *Use of Domination to Commit a Wrong That Caused Injury*

The second element of an alter ego liability claim, requires a showing that Ataraxia used

its dominion over Ridge Hill "to commit a fraud or wrong that injured [Remcoda]."  *D. Klein &

Son, Inc. v. Good Decision Inc.*, 147 Fed. Appx. 195, 196 (2d Cir. 2005) (marks omitted)

(quoting *Mag Portfolio Consult, GMBH v. Merlin Biomed Group LLC*, 268 F.3d 58, 63 (2d Cir.

2001) (marks and citations omitted)).  That the March 2022 Order dismissed Remcoda's fraud

claims against Ridge Hill does not render this prong unsatisfiable, as Ataraxia contends.

Caselaw makes clear that "*even absent fraud*, [the] corporate veil may be pierced if [the

dominating defendant] used its control of the [dominated defendant] 'to perpetrate . . . a

dishonest or unjust act in contravention of [the] plaintiff's legal rights[.]'"  *D. Klein & Son*, 147

Fed. Appx. at 199 (emphasis added) (quoting *Gorrill v. Icelandair/Flugleidir*, 761 F.2d 847,

853–54 (2d Cir. 1985) (marks and citations omitted)).  Indeed,

> misrepresentation as to the identity of the contracting [defendants qualifies as a] dishonest act or wrong [that] satisf[ies] the second requirement for veil piercing. The reason veil piercing in the contract context is infrequent is because the party seeking relief is presumed to have voluntarily and knowingly entered into an agreement with a corporate entity, and is expected to suffer the consequences of limited liability associated with the business form.  But such a presumption is hardly warranted where multiple corporate entities misrepresent themselves to have a single identity.  In such circumstances, a contract partner can be misled into thinking it is dealing with—and will have recourse against—a single, large entity.  Accordingly, in such circumstances, courts may appropriately pierce corporate veils to ensure that a plaintiff can seek relief against the whole entity with whom it reasonably thought it had contracted.

*D. Klein & Son*, 147 Fed. Appx. at 199 (marks and citations omitted); *see also Liberty Highrise*

*Pvt. Ltd. v. Praxis Energy Agents DMCC & Praxis Energy Agents Pte Ltd.*, 531 F. Supp. 3d 854,

861 (S.D.N.Y. 2021) (finding that a court may find alter ego liability when the dominant party

used the subservient company to perpetrate a fraud or had so dominated and disregarded the

entity's corporate form that the entity primarily transacted the defendant's personal business

rather than its own corporate business) (marks and citations omitted)).

Remcoda argues that Ataraxia, dominating Ridge Hill, abused the corporate form by

deliberately misrepresenting its involvement in the transaction to cause Remcoda enter into the

Purchase Agreement.  *See* Doc. 164 at 23–24.  According to Remcoda, Ataraxia now attempts to

hide behind the corporate form to thwart Remcoda's recovery.  *Id.*

The SAC contains numerous specific[26] allegations for why piercing is appropriate.  For

example, the SAC states that Gross, Gunawardhana, and Fletcher regularly referred to "Ridge

Hill/Ataraxia" as a singular unit, advising Remcoda that "Ridge Hill/Ataraxia ha[d] a . . .

relationship with a local joint venture partner Vina Capital, which . . . ensure[d] that Ridge

Hill/Ataraxia had direct access to factories[, and which] guaranteed delivery."  ¶ 23; *see also* ¶

---

[26]  The March 2022 Order found that the FAC did not satisfy the second prong of alter ego analysis because it contained "no non-conclusory allegations that the domination led to Remcoda's injury."  Doc. 131 at 19.

29 (asserting that Gunawardhana informed Remcoda that the "Family Group"—*i.e.*, Ridge Hill, Vogue Tex, and Ataraxia Capital—was able to "offer the connections financial scale controls, and experience that most in the PPE market [could] not [offer]," due to the investor partnerships and joint ventures of Ridge Hill and Ataraxia).  Additionally, Remcoda again emphasizes that prior to entering into the Purchase Agreement, Gross—relaying information given to him by Gunawaradhana—informed Remcoda that Ridge Hill was part of the Ataraxia group of companies, that *Ataraxia* would handle fulfilling the purchase order.  ¶ 30.  Gross also advised that Remcoda was "not dealing with a 'fly by night' operation." *Id.*  Remcoda also emphasizes that Fletcher suggested that Ataraxia would play an integral role in any pre-financing of the transaction, a fact that Remcoda subsequently relayed to another potential financing company as evidence of the stability of the deal.  *See* ¶¶ 31–32.

Lastly, Remcoda again argues that the shared office space, use of Ataraxia email addresses, and fact that Ridge Hill extended the Corporate Offer as part of Ataraxia, provided it assurance that it was doing business with *Ataraxia*, a large, well-resourced company that had been in the business for nearly a decade longer than the newly-formed Ridge Hill.  Remcoda asserts that it relied upon all of the foregoing in deciding to enter into the Purchase Agreement and that had it known of Ataraxia's intention to not stand behind the transaction, it would not have entered into it.

The Court finds these facts sufficient to satisfy the second prong of pleading alter ego liability, as other courts have found in analogous cases.  In *Golomb Mercantile Co. LLC v. Marks Paneth LLP*, No. 18 Civ. 3845 (JFK), 2019 WL 6790678, at *8–10 (S.D.N.Y. Dec. 12, 2019), for example, the plaintiff alleged, like Remcoda does here, that two defendants misleadingly held themselves out to be a single entity, causing the plaintiff to do business with them to its

detriment. *Id.* Specifically, the complaint alleged that in a sales pitch, the defendants emphasized how "[the dominant company] could help [the plaintiff] monetize its [intellectual property]." *Id.* The plaintiff further pleaded that the defendants made various "indications of [their] close relationship . . ., such as their shared offices, equipment, [] employees[.]" *Id.* at *9. Ruling on a motion to dismiss, the court deemed these allegations sufficient to satisfy the second element of an alter ego claim. Similarly, the Second Circuit in *D. Klein & Son*, deemed allegations that two entities "obfuscate[d] their separate identities in dealing with [the plaintiff] both at the time the contractual relationship commenced and throughout their course of dealings" sufficient to satisfy the second prong of alter ego liability. 147 Fed. Appx. at 198 ("This misrepresentation as to the identity of the contracting party is the dishonest act or wrong satisfying the second requirement for veil piercing.").

Like in *Golomb* and *D. Klein & Son*, here, Remcoda has similarly alleged that the Ridge Hill deliberately misrepresented the role of Ataraxia in the transaction, conflating the two entities as one, and causing it to enter into the Purchase Agreement. The Court is unpersuaded by Ataraxia's attempts to distinguish *Golomb* and *D. Klein & Son* from the facts at hand. According to Ataraxia, the acts of wrongdoing in each of these cases were committed by those who held positions at *both* the dominating and dominated companies; the courts therefore predicated their rulings upon the dual position of the defendants' representatives. Doc. 168 at 11. *Id.* Ataraxia contends that this material fact is absent here, where "all the underlying conduct was allegedly committed by Gunawardhana, Fletcher, and Gross, who were employee[s] and/or agent[s] of *Ridge Hill*, not Ataraxia." *Id.* at 11–12 (emphasis added) (quoting ¶¶ 9, 15, 16).

While it is true that the SAC *initially* characterizes Gunawardhana, Fletcher, and Gross, as "employee[s] and/or agent[s] of Ridge Hill," ¶¶ 9, 15, 16, it later regards each of them as

agents of "Ridge Hill/Ataraxia."  The SAC, for instance, plainly alleges that during "a series of emails and text message conversations . . . Gunawardhana and Fletcher referred to the entity for which they worked as Ridge Hill/Ataraxia."  ¶ 23.  With respect to Gross, the SAC also alleges that he acted on behalf of *Gunawardhana*—who purportedly self-identified as an employee of "Ridge Hill/Ataraxia"—in passing along information pertaining to the nitrile glove deal to Remcoda.  ¶ 30.  It is therefore not the case that the SAC regards Gunawardhana, Fletcher, and Gross as employees or agents of *only* Ridge Hill, as distinct from Ridge Hill/Ataraxia. Resolving all doubts in favor of Remcoda, the pleadings point to the opposite conclusion:  that they were agents of *both* Ridge Hill and Ataraxia.

For all of the foregoing reasons, the Court deems the second prong satisfied and permits the claims against Ataraxia as an alter ego of Ridge Hill to go forward.

## IV.    CONCLUSION

For the reasons set forth, the Gross' motion to dismiss is GRANTED in part and DENIED in part.  Specifically, the aiding and abetting fraud claim is dismissed, while the fraudulent inducement claim goes forward.  The motion of Ataraxia is DENIED in full.

The parties are directed to appear for a telephonic case management conference on April 18, 2023 at 10:00 a.m.  The parties are to dial (877) 411-9748 and enter access code 3029857#. The Clerk of Court is respectfully directed to terminate the motions, Doc. 153, 155 and 167. It is SO ORDERED.

Dated:    March 27, 2023
          New York, New York

_____
          Edgardo Ramos, U.S.D.J